PASQUALE ROMANO ET AL., PROSECUTORS, v. HOUSING AUTHORITY OF THE CITY OF NEWARK ET AL., DEFENDANTS.

JOSEPH CHIARAVALLO ET AL., PROSECUTORS, v. HOUSING AUTHORITY OF THE CITY OF NEWARK ET AL., DEFENDANTS.

Argued October 4, 1939—Decided November 8, 1939.

Before Justices PARKER, BODINE and PERSKIE.

For the prosecutors, *Kanter & Kanter* (*Elias A. Kanter*).

For the defendants, *Milton R. Konvitz* and *Frank H. Sommer*.

Endorsing the statements made in the brief of Newark Housing Authority as *amici curiæ* on behalf of their respective clients were:

For State Housing Authority of New Jersey, *Harry L. Tepper*.

For Housing Authority of city of Asbury Park, *Louis L. Levinson*.

For Housing Authority of city of Long Branch, *Stanley Cohen*.

For Housing Authority of city of Atlantic City, *Lewis P. Scott*.

For Housing Authority of city of Elizabeth, *Daniel J. O'Hara*.

For Housing Authority of city of Trenton, *William H. Geraghty*.

For Housing Authority of city of Beverly, *Alexander Denbo*.

For Housing Authority of city of Orange, *Edmond J. Dwyer*.

For Housing Authority of borough of Princeton, *William C. Vandewater*.

For Housing Authority of city of New Brunswick, *Morgan R. Seiffert*.

BODINE, J. In these two cases the fundamental legal question is the power of the Newark Housing Authority to condemn prosecutors' property situate in that city. The legislature by *Pamph. L.* 1938, *p.* 65 (*R. S.* 55:14-A1) empowered the city of Newark by ordinance to create a body corporate and politic to be known as the Housing Authority of Newark. The Board of Commissioners of that city created such a body and appointed the members thereof. On March 16th, 1939, this Housing Authority found it necessary to acquire the prosecutors' properties for the purpose of building a public housing project for families of low income, and authorized the commencement of the condemnation proceedings in question. Commissioners to fix the values were appointed. However, writs of *certiorari* were allowed, together with a limited stay pending the determination as to the validity of the creation of the Newark Housing Authority and its powers to condemn land pursuant to law.

In 1866, Chief Justice Beasley wrote the opinion of the Court of Errors and Appeals in the *Tide-Water Co.* v. *Coster,* 18 *N. J. Eq.* 518. The Tide-Water Company was called into being to assist in the draining of the tide-water marshes adjacent to Newark bay and its tributary streams. He there said: "That the legislative authority is competent to effect the end provided for in this, I can entertain no doubt. The purpose contemplated, is to reclaim and bring into use a tract of land covering about one-fourth of the county of Hudson, and several thousand acres in the county of Union. This large district is now comparatively useless. * * * To remove these evils and to make this vast region fit for habitation and use, seems to me plainly within the legitimate province of legislation; and to effect such ends, I see no reason to doubt that both the prerogatives of taxation and of eminent domain may be resorted to. From the earliest times, the history of the legislation of this state exhibits many examples of the exercise of both these powers for purposes not dissimilar, and by these means, without question, many improvements have been effected. The principle is similar to that which validates the transfer by legislative authority, of private property to private corporations for the construction of railroads

and canals, or the construction of sewers and streets, and the imposition of the expense on the lands benefited. It is the resulting general utility which gives such enterprises a kind of public aspect, and invests them with privileges which do not belong to mere private interests. I have no difficulty, therefore, in concluding that the legislature was fully authorized to adopt measures to accomplish the general design embraced in this act, now under the consideration of this court."

That the courts of this state have upheld legislation designed in the interest of the public health, safety and morals to eliminate blocks of unsafe and unsanitary dwellings by taking by condemnation parts of land for the purposes of parks and playgrounds for the benefit of the public is apparent in the case of *Simon* v. *O'Toole,* 108 *N. J. L.* 32; *affirmed, Id.* 549.

For more than thirty years forward looking persons have made exhaustive studies of slum clearance and the evil result of slum continuance. Jacob Riis, from the vantage point of a reporter on a New York City newspaper, was among the first to direct public attention to slum evils, and the fact that their continuance was always sponsored by the property owner class who unduly profited from the miseries of others. However, it remained for the federal government, under forward looking leadership, to make effective warfare for the benefit of one-third of the nation's "ill-housed, ill-clad and ill-nourished" citizens. Poor housing conditions, it has been shown, definitely produce disease, an early death rate, as well as many juvenile delinquents.

The United States Housing act was passed in 1937. 50 *U. S. Stats.* 888. Government funds and credit were pledged to assist the states and the subdivisions thereof to remedy the unsafe and unsanitary housing conditions prevalent, and to correct the shortage of decent, safe and sanitary dwellings for low income group families. The United States Housing Authority was authorized to loan public moneys to housing agencies to be set up in order to accomplish the desired results. The act provides that the cost of a dwelling unit for such families shall not exceed $4,000, or more than $1,000 per room, except that in cities where the population exceeds five

hundred thousand, the limits are $5,000 and $1,250, respectively. The projects are of great utility, but not of elaborate or expensive design. The Federal Housing Authority supervises plans and is authorized to issue bonds.

That the cities of this state have welcomed the project is evidenced by the loan contracts which have been applied for and approved in the following amounts: Asbury Park, $675,000; Atlantic City, $1,855,000; Camden, $1,281,000; Elizabeth, $4,094,000; Harrison, $993,000; Jersey City, $4,496,000; Long Branch, $546,000; Newark, $11,835,000; North Bergen, $863,000; Perth Amboy, $1,145,000; Summit, $391,000; Trenton, $2,429,000.

Most of the states of the Union have enacted legislation similar to that now being questioned, and so far as indicated to us the constitutionality of such legislation has not been judicially questioned.

Since slum clearance is certainly as much of public benefit as the clearance of swamps and waste lands, our problem is confined to a determination as to whether the Housing Authority of the city of Newark is a valid body corporate and politic. There can be no doubt thereof, since its organization was by ordinance of the city pursuant to the legislative grant of 1938, and further all acts taken thereunder were ratified by chapter 187 of *Pamph. L.* 1939, *p.* 542. Being such a body corporrate the state has wisely delegated to it the power of eminent domain.

Our Court of Errors and Appeals, in sustaining the act creating the Milk Control Board, in the case of *State Board of Milk Control* v. *Newark Milk Co.*, 118 *N. J. Eq.* 504, said: "The legislature indubitably has power to vest a large measure of discretionary authority in the agency charged with the administration of a law, enacted in pursuance of the police power, to secure the health and the safety of the people. * * * It is only necessary that the statute establish a sufficient basic standard—a definite and certain policy and rule of action for the guidance of the agency created to administer the law."

The statute authorizing the local Housing Authority defines the words necessary to a complete understanding thereof and

fixes duties with regard to rentals, tenant selection, fixes reasonable limits, and restricts the issuance of bonds. There is no unlimited delegation of legislative power, but it is obvious that no slum clearance can be effected without the grant of the powers enumerated in the act. A basic standard, and a definite and certain policy is laid down for the guidance of the administrators constituting the local Housing Authority.

Mr. Justice Heher said in *Mansfield & Swett, Inc., v. West Orange,* 120 *N. J. L.* 150, 151: "The state possesses the inherent authority—it antedates the constitution—to resort, in the building and expansion of its community life, to such measures as may be necessary to secure the essential common material and moral needs. The public welfare is of prime importance; and the correlative restrictions upon individual rights—either of person or property—are incidents of the social order, considered a negligible loss compared with the resultant advantages to the community as a whole. Planning confined to the common need is inherent in the authority to create the municipality itself. It is as old as government itself; it is of the very essence of civilized society. A comprehensive scheme of physical development is requisite to community efficiency and progress. * * * The police power of the state may be delegated to the state's municipal subdivisions created for the administration of local self government, to be exerted whenever necessary for the general good and welfare. It reaches to all the great public needs; and the right of property yields to the exercise of this reserve element of sovereignty. The authority is of the essence of the social compact. The genius of organized government is the subordination of individual personal and property rights to the collective interest."

The statute although it may in effect provide for the extension of money or credit to the Housing Authority, does not thereby violate the provisions of the State Constitution prohibiting the appropriation of money to or for the use of any society, association or corporation; because whatever moneys or credits extend to the Housing Authority, directly or by way of exemption from taxation or otherwise, are no more than an indirect appropriation from the state's general funds

for the benefit and support of one of the state's agencies organized to engage in the accomplishment of an important public work. *Rutgers College* v. *Morgan,* 70 *N. J. L.* 460.

Public property is not subject to taxation in the absence of express authority. *Trustees of Public Schools* v. *City of Trenton,* 30 *N. J. Eq.* 667. "The immunity of the property of the state, and of its political subdivisions, from taxation, does not result from a want of power in the legislature to subject such property to taxation. But inasmuch as taxation of public property would necessarily involve other taxation for the payment of the taxes so laid." *Id.* 668.

Property may be classified for purposes of taxation with respect to its use. Public ownership necessarily imports a public use. *Essex Park Commission* v. *West Orange,* 75 *N. J. L.* 376, 379. Although for a period of time the property of the Housing Authority is exempt from taxation, we are not here concerned with the exemption of private property from taxation for a five years period as in *Koch* v. *Essex County Board of Taxation,* 97 *N. J. L.* 61, but with the exemption of public property for a period of time in order that a most important state and national purpose may be effected.

In conclusion we can only say that there is no more reason why the legislature of our state may not, under its power of eminent domain, take private property in order to effect slum clearances than that it may take private property in order to provide for roads, railroads and swamp clearances. It can delegate and has delegated such authority to private corporations and commissions in order to effect its purpose. The only limitation upon the power to take in such cases is the necessity of affording just compensation for the property taken. This the legislature has provided for in the act under review.

We have carefully examined all the other points made in the brief and argument of the learned counsel for the prosecutors, and can only conclude that they are without merit.

The writs will be dismissed, with costs.