HENRY J. BEHNKE, PLAINTIFF-APPELLANT, v. NEW JER-
SEY HIGHWAY AUTHORITY, THEODORE D. PARSONS,
ATTORNEY-GENERAL OF THE STATE OF NEW JER-
SEY, AND WALTER T. MARGETTS, JR., TREASURER
OF THE STATE OF NEW JERSEY, DEFENDANTS-
RESPONDENTS.

Argued March 23, 1953—Decided May 25, 1953.

18

*Mr. Douglas V. Ailken* argued the cause for appellant.

*Mr. Roger Hinds* submitted a brief for reversal on behalf of New Jersey Taxpayers Association, as *amicus curiae.*

*Mr. Morris M. Schnitzer* argued the cause for respondent New Jersey State Highway Authority.

*Mr. Theodore D. Parsons*, Attorney-General, submitted a brief *pro se* and on behalf of respondent Walter T. Margetts, Jr., Treasurer of the State of New Jersey. *Mr. Benjamin Van Tine*, Deputy Attorney-General.

The opinion of the court was delivered by

HEHER, J. We have here a proceeding under the Declaratory Judgments Act (*N. J. S.* 2A:16–50 *et seq.*) to determine the constitutional sufficiency of *c.* 17 of the *Session Laws of 1952*, purporting to authorize "a liability of the State of New Jersey * * * for the guaranty of punctual payment" of the principal and interest accruing upon bonds, not exceeding $285,000,000 in the aggregate principal sum, to be issued by the New Jersey Highway Authority, a body corporate and politic established in the State Highway Department by *c.* 16 of the *Laws* of the same year to provide, *inter alia*, for the construction and operation of "modern express highways" and other "highway projects" as therein delineated, and in particular the consummation of a highway construction project to be known as "The Garden State Parkway," extending in a general southerly direction from such points at Paterson and also at State Highway Route No. 17 in Paramus or Ridgewood as the Authority may determine to be most feasible and practicable to a point at or near the city of Cape May. *L.* 1952, *pp.* 65, 91, 95; *N. J. S.* 27:12B–1, 20.

It was directed that, "For the purpose of complying with the provisions of the State Constitution," the act authorizing the creation of state liability for the guaranty of the bonds "be submitted to the people" at the general election of 1952. *L.* 1952, *pp.* 95, 100. There was such submission, and the act was "approved."

The Superior Court, Judge Ewart sitting, sustained the Guaranty Act as not in contravention of state constitutional limitations upon the use of the State's credit, moneys, and taxing power (*Behnke v. New Jersey Highway Authority*,

25 *N. J. Super.* 149); and this court certified the cause for appeal at the instance of plaintiff.

The Authority Act itself is not under attack. The Authority is constituted "an instrumentality exercising public and essential governmental functions," and it is provided that the exercise by the Authority of the powers conferred by the act "in the construction, operation and maintenance of projects shall be deemed and held to be an essential governmental function of the State." *L.* 1952, *c.* 16, *sec.* 4. The body is given perpetual succession; capacity to contract, to sue and be sued in its own name, and to use an "official seal"; and to acquire, hold and dispose of real and personal property in the performance of its functions and duties, and to exercise the right of eminent domain; and it is empowered to construct and operate highway projects, including feeder roads; to issue bonds or notes of its own "and to provide for the rights of the holders thereof as provided" in the act; to establish and collect tolls or other charges for transit over or use of its highway facilities; to receive and accept, subject to the approval of the Governor, federal grants in aid of the acquisition or construction of any project within its domain, "and to receive and accept aid or contributions, except appropriations by the Legislature, from any source, of either money, property, labor or other things of value, to be held, used and applied only for the purposes for which such grants and contributions may be made"; to adopt by-laws for the regulation of its affairs and the conduct of its business, and to establish rules and regulations for the use of any project; and to hire such employees and agents, administrative and technical, as it may deem necessary, and to fix compensation for the service. *Section 5.* The Authority is authorized, subject to the limitations of the act, to set the terms of its bonds and notes, and to pledge all or any part of its tolls and revenues as security for their payment, and otherwise to safeguard its issued securities and regulate the rights of the holders. *Sections 8, 9.* Except "as otherwise provided by or pursuant to any law" thereafter "submitted to the people" under *Section* II of *Article* VIII of

the *State Constitution*, and approved by a majority of the legally qualified voters of the State voting thereon, bonds or notes issued under the provisions of the act "shall not constitute a debt or liability of the State or of any political subdivision thereof or a pledge of the faith and credit of the State or of any such political subdivision, and all such bonds or notes shall contain on the face thereof a statement to that effect." *Section* 10. The State itself makes a pledge to the holders of the issued bonds or notes not to "limit or restrict the rights" thereby vested in the Authority to pursue any project as defined in the act "or.to establish and collect such tolls or other charges as may be convenient or necessary to produce sufficient revenues to meet the expenses of maintenance and operation thereof and to fulfill the terms of any agreements made with the holders of bonds or notes authorized" by the act "or in any way impair the rights or remedies of the holders of such bonds or notes until the bonds and notes, together with interest thereon, are fully paid and discharged." *Section* 11. Bonds and notes issued under the act are made legal security. *Section* 12. It is declared that the exercise of the powers granted by the act "will be in all respects for the benefit of the people of the State, for the increase of their commerce and prosperity, and for the improvement of their health and living conditions," and "constitute the performance of essential governmental functions," and therefore its projects, property and income and its issued bonds or notes, their transfer, and the income therefrom are rendered immune from taxation. *Section* 16. The Authority is vested with the operative and the regulative functions; and there are sanctions for violations. *Section* 18. And it is enjoined to make an annual report of its activities and financial operations to the Governor and to the Legislature. *Section* 19. Then comes specific authority for the construction of "The Garden State Parkway." *Section* 20.

The Guaranty Act provides that all money to be raised by the issuance of bonds guaranteed thereunder by the State "shall be applied only to finance the Garden State Parkway

in accordance with the Authority act," and such bonds shall "mature within thirty-five years from their respective dates and bear interest at a rate or rates not exceeding three per centum (3%) per annum," limited in principal amount to the aggregate stated *supra*. *L.* 1952, *c.* 17, *secs.* 1, 2. The "punctual payment" of the principal and interest accruing on bonds issued in accordance with the act is "unconditionally guaranteed by the State of New Jersey." The "guaranty made" of the bonds of the Authority issued under the act "shall make the State unconditionally liable for the payment, when due, of the principal of and interest on the bond so guaranteed"; and "In the event that the Authority shall fail to pay, when due, the principal of or interest on any bond so guaranteed, the State Treasurer shall pay the same to the holder thereof out of the funds provided pursuant to this act and thereupon the State shall be subrogated to the rights of the holder so paid." *Sections* 3, 4. To provide "ways and means, exclusive of loans," to discharge any guaranty made under the act and to "provide funds" to that end, the act "appropriated" from the State's motor fuel tax receipts "so much as may be required for such purposes, and the State Treasurer is" directed to make provision accordingly. The power to tax real and personal property is also invoked. *Sections* 5, 6, 7.

The insistence is that the State's guaranty of the bonds of "a public corporation, although created and commissioned to perform an essential public function," constitutes a loan of the State's credit in contravention of *Article* VIII, *Section* II, *paragraph* 1 of the *Constitution of* 1947, in words thus: "The credit of the State shall not be directly or indirectly loaned in any case."

It is urged that this is a peremptory command all inclusive in its operation, interdicting the State's unconditional guaranty of "the obligations of a corporation, either public or private." Significance is seen in the omission from this provision of the recently revised Constitution of a specific exception of "public corporations, to accomplish governmental purposes," of which the particular type had then

become commonplace. The incorporation of the limitation in the 1947 Constitution in the identical terms of the 1844 Constitution is deemed conclusive of a purpose to bar the extension of the State's credit, directly or indirectly, in any and every case.

*Amicus curiae* suggests that the Constitution itself makes what is termed the obvious distinction between "a donation or appropriation, on the one hand, and a loan of the credit of the State, on the other hand," by laying down in Article VIII, *Section* II, *paragraph* 3 a "qualified prohibition" of donations and appropriations by the State, but in *Article* VIII, *Section* II, *paragraph* 1, an "unqualified prohibition of loans of the state's credit." And it is also urged that there is a difference of substance in the constitutional sense between "the making of a loan, or the incurring of an indebtedness, on the one hand, and a *loan of credit* on the other," and the case at hand involves "not a loan of money either by or to the State," but rather "a loan of the *credit* of the State" to an "autonomous corporate entity." It is said that if the framers of the 1947 Constitution had in mind "a modern exception" permitting the loan of the State's credit to a "state-created independent, autonomous, corporate entity known as an 'Authority,'" the intention would have been expressed in terms; also, that the limitation was reenacted "in the light of its previous judicial and legislative interpretation and application," and since the provision of the 1844 Constitution had not been construed as permitting the loan of the State's credit to a "separate, autonomous corporation even for a public purpose," there is a conclusive presumption that the framers of the 1947 Constitution, "in reenacting the provision without change, did not intend that it should be construed differently." In a word, it is contended that the particular limitation "aims, not at the purpose of the borrower's expenditure, but at any loan of the State's credit, for any purpose, public or private, as distinguished from the State's own appropriation or the loan of the State's own money," and the words "in any case" are the equivalent of the words "for any purpose."

At the time of the adoption of the 1947 Constitution, the limitation embodied in the 1844 Constitution had not been the subject of judicial scrutiny and assessment, in relation to a public corporation of the class now before us and the purpose to be served; and the adoption of the limitation without phraseological change is without determining significance.

We seek for the reason and spirit of the provision, considered in the context of related limitations and provisions of the instrument embodying the organic law. What is its essential quality and meaning when compared with kindred provisions operative in the same area of governmental action?

A state constitution, unlike the Federal Constitution, is not a grant but a limitation of legislative power. The State Legislature exercises a portion of the sovereign power residing in the people, subject to the limitation imposed by the Federal Constitution and its own organic law, and, as well, those so fundamental in the social compact and the Anglo-Saxon principles of natural justice as to be necessarily implied; and, in the determination of the operative scope of such constitutional limitations, courts are enjoined, as in the construction of statutes and all other written instruments, to collect the sense and meaning of the clause by comparing one part with another, and by considering all the parts as a whole, and not one part as a separate and independent provision bearing no relation to the remainder. This is the primary rule of exposition of constitutional provisions. The thing sought is the intent of the people in imposing the particular restraint. Words and clauses are not to be isolated, but related to each other and to the whole of the instrument, if the real sense of the expression is to be had. The purpose of judicial interpretation is the discovery of "the true sense of the form of words which are used * * *, taking all its parts into consideration, and, if fairly possible, giving them all effect." *Inhabitants of Orvil Tp. v. Borough of Woodcliff*, 64 *N. J. L.* 286 (*E. & A.* 1900). Whether the subject matter of such interpretive inquiry be an agreement between parties, a statute, or a

constitution, the object is "the thought which it expresses." *Newell v. People*, 7 *N. Y.* 9, 97 (*Ct. App.* 1852).

But, in the quest for the intention and meaning of a constitutional limitation, its essential character must ever be kept in mind. The primary design of a constitution is to put the fundamentals of government beyond the control of "the varying moods of public opinion," to use the language of Judge Cooley; and it is therefore to ·be presumed that the words employed have been carefully measured and weighed to convey a certain and definite meaning, with as little as possible left to implication. *Wolcott v. Wigton*, 7 *Ind.* 44 (*Sup. Ct.* 1855); *People v. Purdy*, 2 *Hill* 31 (*N. Y. Sup. Ct.* 1841); *Cooley's Constitutional Limitations* (*8th ed.*), 124, 128. A constitutional interdiction against the exercise of a particular power is in the nature of an exception; and it is the settled rule of judicial policy in this jurisdiction that a legislative enactment will not be declared void unless its repugnancy to the Constitution is so manifest as to leave no room for reasonable doubt. The limitation upon the exercise of the legislative function must be clear and imperative. This constitutes a basic restraint upon the power of the courts, federal and state, to nullify a statute for want of constitutional congruity. A forced or unnatural construction is to be avoided. The limitation is to be established and defined by the words of the instrument, assessed in relation to the context and kindred provisions, and not by some supposed underlying spirit that is not given tangible expression. *State v. Murzda*, 116 *N. J. L.* 219 (*E. & A.* 1936); *State Board of Milk Control v. Newark Milk Co.*, 118 *N. J. Eq.* 504 (*E. & A.* 1935); *Attorney-General v. McGuinness*, 78 *N. J. L.* 346 (*E. & A.* 1910).

While constitutional limitations are in their very nature inflexible in meaning and immune to varying public opinion, social and economic needs arising from the complexities of modern life call for new applications of the principle; and the Constitution would not serve its essential purpose were it insensitive to the demands of a changing society and economy. *Home Building and Loan Association v. Blaisdell*,

290 *U. S.* 398, 54 *S. Ct.* 231, 78 *L. Ed.* 413 (1934) ; *Euclid
v. Ambler Realty Co.*, 272 *U. S.* 365, 47 *S. Ct.* 114, 71 *L. Ed.*
303 (1926). The principle itself is unalterable except by
the will of the people expressed in the constitutional mode,
but accommodation to new needs without a violation of the
essence of the principle does not contravene the intent of the
instrument. We are concerned with the spirit of the limita-
tion, and in that inquiry related provisions must be held in
view. The true rule of construction "is not to consider one
provision of the Constitution alone, but to contemplate all,
and therefore to limit one conceded attribute by those qualifi-
cations which naturally result from the other powers granted
by that instrument, so that the whole may be interpreted by
the spirit which vivifies, and not by the letter which killeth."
*Downes v. Bidwell*, 182 *U. S.* 244, 21 *S. Ct.* 770, 797, 45
*L. Ed.* 1088, 1116 (1901), White, J.

*Article* VIII of the 1947 *Constitution* embodies limitations
upon the exercise of governmental power relating to matters
of taxation and finance. In the abstract, the interdiction of
*paragraph* 1 of *Section* II against the loaning of the State's
credit may well be deemed absolute and all-embracive. The
Authority maintains that a guaranty by the State of the
obligations of a "public corporation, issued to finance a pub-
lic purpose, is a valid use and not a prohibited loan of the
State's credit." Paradoxically, although the Authority Act
provides (*section* 10) that the bonds shall not constitute "a
debt or liability" or "a pledge of the faith and credit" of the
State or of any political subdivision of the State, we have
here, under the sanction of the Guaranty Act, an uncondi-
tional guaranty of the punctual payment of the bonds by
the State itself in the event of default by the Authority;
and thus the State's credit supports the bonds. But, comple-
mented by referendum approval, this is an effective exercise
of legislative power within the framework of constitutional
authority.

The literal sense of the terms of the credit ban embodied
in paragraph 1 of the article and section of the Constitution
cited *supra* is modified by paragraph 3, forbidding the crea-

tion of "a debt or debts, liability or liabilities" of the State, which together with any previous "debts or liabilities" shall exceed at any time one per centum of the total amount appropriated by the general appropriation law for that fiscal year, unless the same shall be authorized by a law "for some single object or work distinctly specified therein," and, regardless of any limitation relating to taxation in the Constitution, such law shall provide "the ways and means, exclusive of loans, to pay the interest of such debt or liability as it falls due, and also to pay and discharge the principal thereof within thirty-five years from the time it is contracted," and be "approved" by a majority of the legally qualified voters of the State voting thereon upon due submission at a general election. All money raised in this wise "shall be applied only to the specific object stated" in the law, "and to the payment of the debt thereby created"; and the law is made irrepealable "until such debt or liability and the interest thereon are fully paid and discharged." This constitutional limitation has no application to "any money that has been or may be deposited with this State by the government of the United States," nor to the "creation of any debts or liabilities for purposes of war, or to repel invasion, or to suppress insurrection or to meet an emergency caused by disaster or act of God."

*E converso,* the State's power in this regard is circumscribed only as therein delineated. It may incur "debts" or "liabilities" upon compliance with the constitutional formula. It would seem to be axiomatic that, if there be adherence to the constitutional directive, the State could, in the exercise of the essential governmental function, directly consummate the particular project for the public good and welfare and itself incur the absolute liability arising from the sale of its bonds to finance the project; and by the same token the State may fulfill the project by means of an instrumentality such as we have here, and provide in the service of the public interest the financial support necessary for an economical and efficient performance of the undertaking, in the form of an unconditional guaranty of the

payment of the bonds issued by the Authority to that end. It is conceded that the State's guaranty of the Authority's bonds for the particular project will effect a saving in interest of $80,000,000.

Such is the spirit and the indubitable reason of these provisions of the Constitution, taken and compared together; and there must needs be this relation of the one to the other if we are to arrive at the intention which is the life of the expression and the true object of judicial interpretation. The injunction of *paragraph* 1 of *Section* II of *Article* VIII of the *Constitution* against the loaning of the State's credit is subject to the exercise of the authority encompassed by the specific terms of *paragraph* 3.

Strictly, the word "debt" imposes an absolute liability; but the term "liability" is broader and includes in addition existing obligations which may or may not in the future eventuate in an indebtedness. *City of Camden v. Allen*, 26 *N. J. L.* 398 (*Sup. Ct.* 1857); *Coulter Dry Goods Co. v. Wentworth*, 171 *Cal.* 500, 153 *P.* 939 (*Sup. Ct.* 1915); *McCrea v. First National Bank*, 162 *Minn.* 455, 203 *N. W.* 220 (*Sup. Ct.* 1925); *Irving Bank Columbia Trust Co. v. New York Ry. Co.*, 292 *F.* 429 (*D. C. S. D. N. Y.* 1923). "Liability" is a word of "most comprehensive significance," including almost every character of hazard or responsibility, absolute, contingent or likely. *Wentz v. State*, 108 *Neb.* 597, 188 *N. W.* 467 (*Sup. Ct.* 1922); *Brewster v. Deschutes County*, 137 *Or.* 100, 1 *P. 2d* 607 (*Sup. Ct.* 1931). It connotes legal responsibility—the state of one who is "bound or obliged in law and justice" to do something. *Joslin v. New Jersey Car-Spring Co.*, 36 *N. J. L.* 141 (*Sup. Ct.* 1873). And the word "debt" has no fixed legal meaning; it takes shades of meaning from the occasion of its use and color from accompanying words. *Electric Reduction Co. v. Lewellyn*, 11 *F. 2d* 493 (*C. C. A.* 3 1926); *Morrow v. Hayes*, 226 *Mich.* 301, 197 *N. W.* 554 (*Sup. Ct.* 1924); *Liberty Mutual Insurance Co. v. Johnson Shipyards Corporation*, 6 *F. 2d* 752 (*C. C. A.* 2 1925).

The State's guaranty of the Authority's bonds issued for the consummation of the specific project does not constitute a "loan" of the State's credit within the interdiction of the constitutional limitation. There is no pledge of the State's credit to private enterprise; it is rather the State's own debt or liability incurred in the service of an essential public need through the instrumentality of the Authority. The construction and operation of this toll facility compose a state project for public use, and it does not matter that for administrative reasons deemed good and sufficient the fulfillment of the project was entrusted to an autonomous body created by the State. The Authority is but the instrument by which the work is to be accomplished; the highway and all its property are held for the State; the corporate body exercises a public function on behalf of the sovereign, and is subject to control and dissolution by the sovereign which gave it being conditioned only upon observance of the constitutional guaranties against the impairment of the obligation of contract. *New Jersey Turnpike Authority v. Parsons*, 3 *N. J.* 235 (1949). The State's undertaking is the satisfaction of the bonds in the event the revenue from tolls and otherwise shall be insufficient for the purpose. It would be unrealistic to hold, as is suggested, that "the voters' approval" under paragraph 3 will "justify direct borrowing" by the State for this public purpose, but not the State's guaranty of the bonds of the public instrumentality created for the execution of the project. There is no discernible reason of policy for this distinction. It is an arbitrary and illusory differentiation at variance with the basic intent and purpose.

The case differs fundamentally from *New Jersey Turnpike Authority v. Parsons*, cited *supra*. There, the bonds issued by the Authority to finance the particular highway project imposed no liability upon the State, directly or indirectly. Unlike the case now before us, there was no state guaranty of the bonds issued by the Authority; and the validity of this exclusive obligation of the Authority was not dependent upon approval by the electorate under the cited constitutional

limitation. As Chief Justice Vanderbilt said in that case, this constitutional regulation is applicable only where "the bonds will 'create * * * a debt or debts, liability or liabilities of the State.' This the Turnpike Authority Act does not do." There, the statute expressly provided that the bonds of the Authority "shall not be deemed to constitute a debt or liability of the State * * * or a pledge of the faith and credit of the State," but rather an obligation of the Authority "payable solely" from the tolls and revenues therein expressly pledged for their payment. Here, the Authority's bonds are supported by the State's guaranty; and, while the referendum approval imparts constitutional sanction to the statutory plan, and we have naught to do but apply the Constitution as it is written, leaving the wisdom of the policy to the Legislature and the people, we would suggest the danger to the State's credit and solvency inherent in the unrestrained accumulation of state liability on the assumption that all such projects will be and remain self-supporting.

And, by the same reasoning, the State's guaranty of the Authority's bonds does not constitute an "appropriation of money to a corporation" within the intendment of *Article VIII, Section III, paragraph 3* of the 1947 *Constitution*, forbidding the State or any county or municipal corporation from making an appropriation of money "to or for the use of any society, association or corporation whatever."

This provision has no application to "appropriations or loans to a public corporation to finance a public purpose." *City of Camden v. South Jersey Port Commission,* 4 *N. J.* 357, 368 (1950); *Rutgers College v. Morgan,* 70 *N. J. L.* 460 (*E. & A.* 1904), affirmed 71 *N. J. L.* 663 (*E. & A.* 1905); *Romano v. Housing Authority, Newark,* 123 *N. J. L.* 428 (*Sup. Ct.* 1939), affirmed 124 *N. J. L.* 452 (*E. & A.* 1940).

It is next urged that the appropriation of state revenues for debt service "over the term of State guaranteed bonds of a public authority" transgresses the requirement of *Article VIII, Section II, paragraph 2* of the 1947 *Constitu-*

*tion* that "state expenditures each year shall be covered by one general appropriation law."

The Guaranty Act in this regard complies with the directive of *paragraph* 3 of *Section* II of the cited article of the Constitution that the law supply the ways and means, exclusive of loans, to pay the interest on the debt or liability as it falls due, and to pay and discharge the principal within the time prescribed. The provision thus invoked by plaintiff is a creation of the 1947 Constitution, and, when related to the associate clauses, it is evident that it does not govern debt service of long-term liabilities permissible under paragraph 3. The general provision is qualified by the particular.

Finally, it is insisted by plaintiff that the proposed Parkway constitutes a "local improvement," and the execution of the plan to levy real and personal property taxes for its support does violence to the basic principle of *Article* VIII, *Section* I, *paragraph* 1 of the 1947 *Constitution* that property shall be valued for taxation under general laws and by uniform rules.

Without assessing the intrinsic quality of this provision of the Constitution, it suffices to say, in the words of Chief Justice Vanderbilt, that the project here is "designed to serve the best interests of the entire State and not merely those of particular localities." *City of Newark v. New Jersey Turnpike Authority,* 7 *N. J.* 377, 387 (1951). The Parkway was conceived as an essential contribution to the State's transit facilities that will also alleviate congestion on existing highways and substantially reduce traffic hazards.

These points are additionally made by *amicus curiae*: (a) The object of the Guaranty Act is not expressed in the title as required by *Article* IV, *Section* VII, *paragraph* 4 of the *State Constitution,* and the title is misleading; (b) the liability authorized by the Guaranty Act "is not 'for some single object or work distinctly specified therein,' as required by" *Article* VIII, *Section* II, *paragraph* 3 of the *Constitution;* and (c) since the Guaranty Act "made chapters 16 and 13, L. 1952, applicable, the latter were required to be inserted in the former."

 (a) We find the title wholly adequate, and in no sense misleading. The specific point is that the title describes the highway as a "Parkway," although it is to be a "freeway" for a substantial portion of the route, *i. e.*, within the boundaries of Ocean and Cape May Counties; this latter under other statutes, *L.* 1952, *c.* 13; *L.* 1950, *c.* 198. "Parkway" is defined by statute as a state highway designed "for through passenger traffic * * * with special treatment in landscaping and planting * * * and other necessary noncommercial facilities"; and "freeway," as a state highway for "through mixed traffic." *N. J. S. A.* 27:7A–1. This is termed a "radical difference."

 But it is certainly not that in regard to the expression of the object of the act in the title. It is not essential that the title be an abstract or synopsis of the contents of the statute. The title is a label, not an index. It suffices if the title give expression to the leading or general subject of the act and a succinct indication of the legislation respecting it. The "object" of a law is not to be confused with its "product." *Bucino v. Malone*, 12 *N. J.* 330 (1953).

 (b) And the Guaranty Act satisfies the constitutional requirement (*Article VIII, Section II, paragraph* 3) that the liability undertaken "be authorized by a law for some single object or work distinctly specified therein."

 The criticism is that there "is nothing 'distinct' about the specification of the 'work' or object authorized" by the act; "neither the route nor the extent, nor the character, nor the cost to the taxpayer was 'distinctly specified therein,'" it is said. Such particularity is not required, nor would it be feasible. The design of this constitutional limitation is the confinement of the debt or liability to a "single object or work." The money thus provided cannot be expended for one purpose under the guise of another. This for the protection of the State's revenue and credit as well as for an understanding appraisement of the project by the electorate.

(c) "Existing law" has not been made "a part" of the Guaranty Act in violation of *Article IV, Section VII, paragraph* 5 of the *Constitution*. There are references to the

Authority Act in the Guaranty Act, but none of the former is made a part of the latter in the constitutional sense. The ruling interpretive principle is to be found in *Bradley & Currier Co. v. Loving,* 54 *N. J. L.* 227 (*Sup. Ct.* 1892); *Kennedy v. Borough of Belmar,* 61 *N. J. L.* 20 (*Sup. Ct.* 1897); *Hutches v. Borough of Hohokus,* 82 *N. J. L.* 140 (*Sup. Ct.* 1911); *Jersey City v. Martin,* 127 *N. J. L.* 18 (*E. & A*: 1941).

Judgment affirmed.

OLIPHANT, J. (dissenting). I reluctantly find myself forced to dissent from the views of the majority as expressed in the opinion filed in this case.

*Article* VIII, *Section* II, *paragraph* 1 of the *Constitution* states "The credit of the State shall not be directly or indirectly loaned in any case."

The majority opinion holds that this section must be read in conjunction with *Article* VIII, *Section* II, *paragraph* 3 which deals with the creation, beyond certain limits, of debts or liabilities of the State and provides for the submission of any law creating such debt or liability to a vote of the people. These sections deal with two entirely different subjects.

A reading and study of *chapter* 17 of the *Sessions Laws of* 1952 poses several questions fundamental to any decision in this case. The first is—what is guaranteed under the act? *Section* 2 thereof states that no bonds shall be guaranteed except bonds that will mature within thirty-five years from their respective dates and bear interest at a rate or rates not exceeding 3% per annum. The total amount of bonds authorized is $285,000,000. This provision of the act attempts to stay within the limitation contained in *Article* VIII, *Section* II, *paragraph* 3 which states "also to pay and discharge the principal thereof within thirty-five years from the time it is contracted." What is the time fixed by the constitutional provision? Must it be a reasonable time after the matter has been approved by the voters or can it be

35 years from any period fixed within the next 50 or 75 years?

While *chapter* 16, *L.* 1952, is not directly under attack here its provisions are *in pari materia* with *chapter* 17, *L.* 1952. They are both part of the same statutory scheme. *Paragraph* 8(*a*) of the former statute gives the Authority unlimited power to issue from time to time not only original bonds but bonds and notes for the payment of or for refunding the payment of the principal and interest of bonds or the redemption of bonds or notes. Such bonds or notes are payable out of any revenue of the Authority. By paragraph 9 of the same act not only can the tolls be pledged but the proceeds of bonds and notes can be pledged, and the Authority may also make covenants as to the issuance of additional bonds and notes.

So that it seems to me the guarantee of the State is being extended far into the future, beyond the constitutional limits, and that instead of being a guarantee of a debt as it is called it is in fact permitting an almost unlimited use of the credit of the State for the purpose of furnishing or issuing other bonds in payment of outstanding obligations.

The effect of these two statutes read together indicates that the Authority can use the credit of the State far beyond any period starting from a reasonable time after the approval of the Act by the voters and that is not what I understand to be the meaning of the constitutional provision. The constitutional provision refers to the creation of a debt or liability of the State in any fiscal year, and the 35 year period must run from some date in that fiscal year. My reading of the provisions of *chapter* 16 of the *Laws of* 1952 does not comport with that conception of the constitutional provision.

Now as to the parts of the old freeway which are already in existence, parts of which are called "The Garden State Parkway." If the part between Cranford and Woodbridge is to be taken over by the Authority under *chapter* 16, *section* 21, it can be leased or conveyed at a price fixed by the State House Commission. But that is not so of the parts

in Ocean and Cape May Counties, which, under *L.* 1952, *c.* 13, are to be integrated into this parkway, but still remain as a freeway. True, the act says the property of the Authority cannot be mortgaged, but it is a mere play on words to say that the Authority shall have complete dominion over these properties where they take them by lease and then throw all of the tolls raised therefrom into a pool from which the bonds are to be paid. The use of them either by lease for a minimum rental or by the operation of part of them as a freeway without doubt enhances the credit of this Authority insofar as the issuance of its bonds is concerned.

As to the ways and means by which the money is to be derived for the guarantee of the bonds, here again *sections* 5, 6 and 7 of *chapter* 17 proceed blithely on their way without any reference to the constitutional 35 year period. Further, by *section* 4, under which the State must fulfill its guarantee, it only obtains subrogation to the rights of the bondholders and all the bondholder can look to is a pledge of the tolls and the cash on hand from the sale of bonds and notes. Of course, the State may be fortunate since the Authority is authorized to issue its bonds at an interest rate not exceeding 6% per annum. *Chap.* 16, *sec.* 8, *par.* (*e*).

I doubt that anyone voting for the act in the manner in which it was presented to the electorate or that even some of the prospective bond purchasers realize that the State is only pledging a partial guarantee of the interest on the bonds if the Authority issues them at an interest rate of over 3%; and with the money market as it is at present the pragmatic argument about saving $80,000,000 will rapidly disappear into thin air.

I cannot but conclude that under the act what is being created is not a debt as contemplated under *Article* VIII, *Section* II, *paragraph* 3 of the *Constitution* and that the credit of the State is being used contrary to the provision of *Article* VIII, *Section* II, *paragraph* 1, and by ways and means that are not disclosed by the title of the act or by the propositions as submitted on the ballot to the electorate. This act together with chapter 16 exhibits a studied effort to

circumvent the prohibition of the Constitution against the use of the State's credit through the device of and by the creation of another "Authority."

*For affirmance*—Chief Justice VANDERBILT, and Justices HEHER, BURLING, JACOBS and BRENNAN—5.

*For reversal*—Justices OLIPHANT and WACHENFELD—2.