164 N.J. Super. 115 (1978)
395 A.2d 889
NEW JERSEY ASSOCIATION ON CORRECTION, A NEW JERSEY NOT-FOR-PROFIT CORPORATION, PLAINTIFF-APPELLANT,
v.
DONALD T. LAN, SECRETARY OF THE STATE OF NEW JERSEY, DEFENDANT-APPELLANT.
Superior Court of New Jersey, Appellate Division.
Argued October 30, 1978.
Decided December 1, 1978.
*118 Before Judges FRITZ, BISCHOFF and MORGAN.
Mr. Steven H. Gifis argued the cause for appellant.
Mr. Michael R. Cole, Assistant Attorney General, argued the cause for respondent (Mr. John J. Degnan, Attorney General of New Jersey, attorney; Ms. Charlotte Kitler, Deputy Attorney General, on the brief).
PER CURIAM.
At issue in this appeal is the constitutionality of L. 1978, c. 79, recently approved in a general election by the voters of this State in a referendum held on November 6, 1978. The challenged enactment, known as the Institutional Construction Bond Act of 1978, passed the State Senate on June 8, 1978, the State General Assembly on June 26, 1978 and was signed by the Governor on July 13, 1978. The present action, filed pursuant to the Declaratory Judgments Act (N.J.S.A. 2A:16-50 et seq.), was initiated on September 27, 1978, heard on cross-motions for summary judgment on October 18, 1978, and its constitutionality was upheld by the trial court on October 18, 1978. Notice of appeal was filed on October 20, 1978 and the Supreme Court declined thereafter to consider the matter then pending *119 unheard in the Appellate Division. We accelerated the matter. We now undertake to decide the projected posited issue of the enactment's constitutionality.
L. 1978, c. 79, has the following title:
An Act authorizing the creation of a debt of the State of New Jersey by issuance of bonds of the State in the sum of $100,000,000.00 for public buildings, their planning, erection, acquisition, improvement, construction, reconstruction, development, extension, rehabilitation, demolition and equipment; providing the ways and means to pay the interest of said debt and also to pay and discharge the principal thereof; providing for the submission of this act to the people at a general election; and providing an appropriation therefor.
The critical section of this enactment, § 5, authorizes the issuance of bonds of the State of New Jersey in the total amount of $100,000,000, subject to voter approval, the proceeds of which "shall be allocated, to the maximum extent practicable and feasible, according to the following estimates of costs * * *": $51,000,000 to the construction of public buildings for the mentally retarded in conjunction with the Federal Program for Intermediate Care Facilities/Mentally Retarded; $8,000,000 for improvements and additions to facilities for the mentally ill, to be implemented by the Department of Human Services; $30,000,000 for construction of institutions for the incarcerated, including the completion of the reconstruction of Trenton State Prison, to be implemented by the Department of Corrections; $6,500,000 for the construction of buildings for records and for library facilities for blind and handicapped persons, to be implemented by the Department of Education, and $4,500,000 for the construction of a forensic science facility for the State Medical Examiner, to be implemented by the Department of Law and Public Safety. All of these building projects were legislatively found to be "critically" and "immediately" needed to carry out public responsibilities to the people of this State (L. 1978, c. 79, § 2). All were recommended by the *120 Commission on Capital Budgeting and Planning; all were designed to serve the administrative and institutional needs of State Government.
Plaintiff, appellant herein, a citizens' group concerned with correctional policies and inmates' rights, challenges the constitutional validity of the enactment on the ground that it embraces a multiplicity of purposes, in violation of N.J. Const. (1947), Art. IV, § 7, par. 4, and Art. VIII, § 2, par. 3.[1] While these constitutional provisions may have differing purposes and involve varied concerns in other contexts, they are virtually identical in their application to the present matter. Art. IV, § 7, par. 4 requires that "every law shall embrace but one object, * * *." Art. VIII, § 2, par. 3, specifically applicable to bond issue referenda, provides:
The Legislature shall not * * * create * * * a debt or debts * * * unless the same shall be authorized by a law for some single object or work distinctly specified therein. * * * No such law shall take effect until it shall have been submitted to the people at a general election and approved by a majority of the legally qualified voters of the State voting thereon. * * *
The unconstitutionality of L. 1978, c. 79, can be found, argues appellant, in the inclusion in one enactment of several objects to be served by the issuance of the bonds authorized by this enactment. It points out that these purposes are essentially unrelated to each other, or related only at a prohibited level of abstraction, and are each to be administered by different departments of the Executive Branch. It insists their inclusion within one enactment requiring voter approval for its effectiveness violates the express constitutional mandate designed, in part, to enable independent *121 voter appraisal of each purpose for which bonds were to be issued.
The State's response to this argument is, as stated in its brief, that "[w]hile the bond proceeds may be allocated to several construction projects, serving different societal needs, and administered by different departments of State Government, all share the common characteristic of being public facilities, operated for the public good." Although each proposed facility would serve different functions, each would, nonetheless, "be operated as public buildings used for providing services for the public's good." The different projects are all related to, and in furtherance of, that general purpose, thereby satisfying the test of compliance with the state constitutional standard.
Both parties properly identify the standard by which compliance with the single object rule will be measured, the relatedness vel non of the various matters embraced within one enactment. As observed in Newark v. Mount Pleasant Cemetery Co., 58 N.J.L. 168 (E. & A. 1895):
The evil intended to be guarded against [by the single object rule] was not the inclusion in one act of more than a single matter, but the inclusion therein of matters not properly related among themselves. So by its obvious construction this constitutional provision justifies and permits legislation by one statute, looking toward a single general object, although it contains and enacts various and multiform matters, if those matters are properly related to each other and tend to effectuate the general object. [at 171]
Individual provisions must be "reasonably connected" with a law's object. See Jersey City v. Martin, 126 N.J.L. 353, 363 (E. & A. 1941); Public Service Electric &c., Co. v. Camden, 118 N.J.L. 245, 249 (Sup. Ct. 1937). Thus, for example, in Wilson v. Long Branch, 27 N.J. 360, 373, cert. den. 358 U.S. 873, 79 S.Ct. 113, 3 L.Ed.2d 104 (1958), the court found a single object in an "Act (1) defining `blighted area,' (2) authorizing municipalities to determine *122 that areas are blighted areas, and (3) to undertake the clearance, replanning, development and redevelopment of such areas." In Meadowlands Reg. Dev. Agency v. State, 112 N.J. Super. 89, 125-126 (Ch. Div. 1970), the court upheld, as containing a single object, an act "to reclaim and develop the Hackensack meadowlands," despite the fact that the bill was divided into two segments, Part A creating the Commission and Part B furnishing a method by which conflicting claims to meadowlands property would be resolved.
The constitutional command embraced by the single object rule in both of its manifestations was designed not only to prevent the concealment of the real object of the enactment but to prevent the pernicious legislative practice commonly known as "logrolling" whereby a weak or unpopular measure is coupled with an unrelated popular one in order to facilitate its passage. If permitted, the practice confronts the voter, be he legislator or citizen, with a difficult and unfair choice; he must either forfeit the benefits of the desired legislation in order to vote his conscience on the measure he rejects, or he must accept the provision to which he has objection in order to obtain the benefits of the measure he favors. Independent appraisal of each measure, on its own merits, is frustrated and no one can be certain as to whether each of such improvidently combined provisions would have obtained voter approval had it been presented to the voter on an independent basis. When, however, the single object rule is complied with, the voter is enabled to voice his reaction to the merits of the provision submitted. See, e.g., Rea v. City of La Fayette, 130 Ga. 771, 61 S.E. 707 (Sup. Ct. 1908); Hart v. Bd. of Ed., 299 Mo. 36, 252 S.W. 441 (Sup. Ct. 1923); In re Validation Bonds, City of Moss Point, 170 Miss. 886, 156 So. 516 (Sup. Ct. 1934); Annotation, "Validity of submission of proposition to voters at bond election as affected by inclusion of several structures or units," 4 A.L.R.2d 617 (1949).
*123 We recognize that appropriate compliance with the single object rule will not obviate difficult voter choices. Thus, the voter favoring the legislative purpose may nevertheless object to the amount of the debt authorized by the measure; he may approve the purpose yet disapprove the authorized means for achieving it. In both cases, of course, he must nevertheless vote on the measure as a whole. Although recognizing this limitation on the effectiveness of the single purpose rule, we cannot conclude that the rule lacks all value. It does attempt to protect the voter from the more egregious abuse of his right to choose by insuring him freedom from the necessity of voting singly for two unrelated measures in one bill to each of which he may have opposing reactions.
Authority in this State is not plentiful. What little could be found clearly supports the foregoing. In Behnke v. New Jersey Highway Auth., 13 N.J. 14 (1953), the court, in construing the reach and purpose of N.J. Const. (1947), Art. VIII, § 2, par. 3, said:
The design of this constitutional limitation is the confinement of the debt or liability to a "single object or work." The money thus provided cannot be expended for one purpose under the guise of another. This is for the protection of the State's revenue and credit as well as for an understanding appraisement of the project by the electorate. [at 32; emphasis supplied]
The packaging of disparate objects or works into a single proposition submitted to the voters for a single vote thereon defeats the constitutional right of the voter to appraise on an independent basis each separate and unrelated object authorized by the Legislature. He must vote for all or for none; the possibility of selection is foreclosed.
It is against the foregoing background that we consider the form of the Institutional Construction Bond Act of 1978. The total amount of debt authorized is $100,000,000. Various amounts are allocated to different projects, each to be administered by a separate department of the Executive *124 Branch. Encompassed within this one enactment is authority for debt creation for buildings for the mentally retarded ($51,000,000), for improved facilities and additions thereto for the mentally ill ($8,000,000), for buildings for the incarcerated, including reconstruction of Trenton State Prison ($30,000,000), for a library and record keeping facilities for the handicapped and blind ($6,500,000), and for construction of a forensic laboratory facility ($4,500,000).
The State, conceding, as it must, that the enactment pertains to several matters[2], contends nonetheless that it complies with the mandate of the single object rule in that the common denominator of all proposed expenditures is the construction of needed public buildings. The required relatedness among the several objects of the authorized debt is thus urged as being found in the fortuity that each of the measures will result in the construction of a building.
We are constrained to reject such a broad degree of commonality as adequate compliance with the mandate of the single object rule. The State cannot build private buildings. We assume that authority for debt creation would not be sought for buildings unneeded by the public. All that is left, therefore, of the proffered basis for relating the several purposes of this enactment is the fact that "buildings" will be constructed from the proceeds of the bonds.
Extended to its extreme, the argument of the State in this respect seems to urge that legislation authorizing the issuance of bonds for the announced simple purpose of the erection of "buildings" would pass muster under the single object stricture. We cannot regard the construction of a building, or buildings, without advice concerning the use to *125 which the building will be put, as an appropriate legislative object. A "building" as such is a completely neutral concept. It may accommodate convicts, the mentally ill, office workers, hockey fans, gambling paraphernalia, schools, animals in a zoo, a restaurant, or any of the multifarious purposes to which governmental structures having four walls and a roof may be put. Legislation does not ordinarily provide for the erection of a building without some description of the purpose to which it is to be put. Without such knowledge, no legislator or other voter can determine whether the public need will be met by its construction.
In Schnoerr v. Miller, 4 Ohio App.2d 99, 212 N.E.2d 671 (Ct. App. 1963), aff'd 2 Ohio St.2d 121, 206 N.E.2d 902 (Sup. Ct. 1965), the court confronted the validity of a bond issue where voter approval thereto was obtained on a ballot informing them that the proceeds thereof would be used for "construction of a public building and furnishing and equipping the same." Significantly, this form of ballot was adopted to obscure the purpose to which the building would be put, a bomb shelter, for fear that the municipality lacked power to build one. The court invalidated the issue, noting that the vice in the ballot was not in stating a multiplicity of purposes but in failing to state a single purpose authorized by law. The holding of the Ohio Supreme Court, directly pertinent to the position adopted by the State in this matter, was couched in the following language:
The designation of the purpose as the erection of a "public building" falls far short of informing the voter of the specific improvement contemplated as a result of the bond issue. It would be difficult to conceive of a more indefinite or less descriptive term than "public building." A public building could be a market house, jail, airport, municipal office building, police station, courthouse, hospital, school, sewage disposal plant, garbage incinerator plant, library, stadium, public auditorium, municipal theater, parking garage, etc. The words, "public building," tell the voter only that the taxing authority wishes to erect some kind of a structure. To comply with the statute, the voter must be informed as to what kind of a structure is to be erected. [206 N.E.2d at 904]
*126 The single object rule is not complied with by an abject failure to specify any object at all. Nor will it be deemed complied with by finding relatedness at such a high level of abstraction as to frustrate voter knowledge of what they are being asked to evaluate. For example, voter approval of debt creation for "critically needed public works" would fail to qualify under the single object rule. To hold otherwise would consign to oblivion the constitutional requirement that debt, over the given constitutional limit, can only be created by voter approval of "a law for some single object or work distinctly specified therein" and would empower the State, by adopting a law of extreme generality and obtaining voter approval thereof, to issue bonds at will, without limit as to any object and with any multiple or combination of purposes conceivable. Such a result would be in clear violation of constitutional command.
The State argues from past experience in support of the validity of this enactment. It notes that the combination of disparate matters in one law to be submitted for voter approval has been the norm. L. 1968, c. 128, approved by the voters at the general election in November 1968, and L. 1963, c. 75, rejected by the voters, provide two such examples. In both those enactments allocations were proposed for construction of "public buildings," a term defined to encompass not only "mental, charitable, hospital, training and correctional facilities," but also buildings for various school purposes, including community colleges and higher education. Such examples do not, in our view, support the constitutionality of the measure under consideration; at best they merely bespeak the absence of any challenge thereto. Long-term adherence to an impermissible mode of legislation does not serve the office of a constitutional amendment. Although frequently probative of the intended meaning of an ambiguous legislative or constitutional command, prior practice of dubious constitutional validity cannot serve to nullify that which is clear beyond question.
*127 To us it is clear beyond question that the legislation is unconstitutional. We do not come to that conclusion lightly or without the highest regard and esteem for our coordinate branch of government. Indeed, we accord to that branch a broad presumption with respect to the constitutionality of its enactments. As we are adjured by Behnke, supra:
* * * [I]t is the settled rule of judicial policy in this jurisdiction that a legislative enactment will not be declared void unless its repugnancy to the Constitution is so manifest as to leave no room for reasonable doubt. The limitation upon the exercise of the legislative function must be clear and imperative. [13 N.J. at 25]
We believe the constitutional limitation here under examination is clear and imperative and we have no doubt at all that the legislation is manifestly repugnant to that limitation.
Reversed.
NOTES
[1] Plaintiff organization made the same argument to the legislative committee considering the bill. It appeared at the committee hearing and specifically objected to the inclusion of the measure relating to prison reconstruction on substantially the same grounds as are here being urged. The issue raised was made the subject of debate.
[2] Indeed, L. 1978, c. 79, itself recognizes that § 5 of the act allocates money to several "purposes." Hence, in § 15 it provides:

The moneys in said "Institutional Construction Fund" are hereby specifically dedicated and shall be applied to the cost of the purposes set forth in section 5 of this act, * * * [Emphasis supplied]