**KANSAS TURNPIKE AUTHORITY,**
Appellant,

v.

**Edwin John ABRAMSON and Emmett Johns, Executors of the Estate of John P. Abramson, deceased, Appellees.**

No. 6200.

United States Court of Appeals
Tenth Circuit.

Feb. 29, 1960.

**712**

Edward F. Arn, Wichita, Kan. (Dale Spiegel, Emporia, Kan., and Gale Moss, El Dorado, Kan., were with him on the brief), for appellant.

Samuel Mellinger, Emporia, Kan., for appellees.

Before MURRAH, Chief Judge, LEWIS, Circuit Judge, and WALLACE, District Judge.

MURRAH, Chief Judge.

The appellee contractor for the grading and drainage of a segment of the Kansas Turnpike brought this diversity action against the Turnpike Authority to recover compensation for redoing work which it had already acceptably done, but which was required to be redone due to the fault of no one. The construction contract obligated the contractor to construct, according to specifications, a road bed suitable for the paved surface of the turnpike. This work entailed the laying down of successive layers or "lifts" of earth of specified thickness and moisture density until the embankments were brought to specified grade and drainage. Each lift was to be laid, rolled and inspected before another layer was placed on top of it.

The contractor performed his contract in a satisfactory and acceptable manner on certain parts of the contract area, but before final acceptance as provided in the contract, unusual rains over a period of two weeks softened the "upper lifts" of the embankment to such an extent that it was necessary to rework and recompact them in order to bring them up to specifications. When the contractor refused to do the work without additional compensation therefor, it was agreed that he would proceed to do it and that both parties would keep an account of it and they would then decide whether compensation was due. After the work was done, the Authority finally denied a claim therefor, and this suit was commenced. There is no question concerning the value of the work performed. Our salient question is whether the contract should be construed to provide compensation therefor. The trial court so construed it and entered judgment for the contractor in an agreed amount.

■ The first question is one of jurisdiction, i. e., whether the suit is against the State of Kansas, or rather whether the State is a real party in interest. If so, the suit must be dismissed for lack of diversity. The Kansas Legislature created the Turnpike Authority as a body corporate and politic, and as a public instrumentality, with powers to construct, operate and maintain turnpike projects, and to issue revenue bonds of the Authority, payable solely from revenue to finance such projects. It is exempt from all taxes or assessments upon any property acquired or used by it, and it is clothed with sovereign immunity except to the extent to which it has expressly been made liable. See Anderson Cattle Co. v. Kansas Turnpike Authority, 180 Kan. 749, 308 P.2d 172; State ex rel. Fatzer v. Kansas Turnpike Authority, 176 Kan. 683, 273 P.2d 198. But it is vested with power to sue and be sued in its own name, and the State of Kansas is in no wise interested in judgments for or against it. It is unlike the Commission in State Highway Commission of Wyoming v. Utah Const. Company, 278 U.S. 194, 49 S.Ct. 104, 73 L.Ed. 262, which was "but the arm or alter ego of the state, with no funds or ability to respond in damages." See 278 U.S. at page 199, 49 S.Ct. at page 106. The Authority is not under the supervision of the State or any agency thereof. In sum, it is a public corporation—a creature of the legislature empowered to perform designated proprietary functions without any obligation on the part of the State. The State was therefore not a real party in interest, and the requisite diversity of citizenship is present. Cf. Harrison Construction Co. v. Ohio Turnpike Commission, 6 Cir., 1959, 272 F.2d 337.

■ This brings us to a construction of the contract, and it is well to have in mind some governing canons. The generally accepted rule is that "where one agrees to do for a fixed sum a thing possible to be performed, he will not be excused or become entitled to additional compensation, because unforeseen difficulties are encountered." United States v. Spearin, 248 U.S. 132, 136, 39 S.Ct. 59, 61, 63 L.Ed. 166; see also Day v. United States, 245 U.S. 159, 38 S.Ct. 57, 62 L.Ed. 219; Barnard-Curtis Co. v. United States, 10 Cir., 244 F.2d 565; Smith v. Phillips, D.C., 128 F.Supp. 61; Newcomb v. Schaeffler, 131 Colo. 56, 279 P.2d 409; Restatement Contracts, § 3467; Williston Rev. Ed., § 1963–64. In the words of the Kansas court, "When the principal object of the contract is to obtain a result ' * * * the risk of accomplishing such purpose or result is on the builder." Glass v. Wiesner, 172 Kan. 133, 238 P.2d 712, 716. Where, however, the contract provides for the performance of a given undertaking in accordance with prescribed plan and specification, this rule does not apply, because the contractor is not permitted to vary from the prescribed plans and specifications "even if he deems them improper and insufficient; and therefore cannot be held to guarantee that work performed as required by them will be free from defects, or withstand the action of the elements, or accomplish the purpose intended. Where the contract specifies what he is to do and the manner and method of doing it, and he does the work specified in the manner specified, his engagement is fulfilled and he remains liable only for defects resulting from improper workmanship or other fault on his part, unless there be a provision in the contract imposing some other or further obligation." Friederick v. Redwood County, 153 Minn. 450, 190 N.W. 801; also quoted in McCree & Co. v. State, 253 Minn. 295, 91 N.W.2d 713. See also Schliess v. City of Grand Rapids, 131 Mich. 52, 90 N.W. 700. Whether ours is an "end result" contract or a "specified manner and method" one depends of course upon the intention of the parties, to be gathered from its text and context. Construction by classification or categorization is rendered difficult, if not impossible, by the fact that contracts like ours call for an end result according to specifications. And so, in the last analysis, we must look to the con-

tract by the whole of its parts to determine whether the parties actually intended to provide compensation for extra work required to be done through the fault of no one. Or, more specifically, the question is who assumed the unforeseen risk of the elements.

The construction contract incorporated the standard specifications for state road and bridge construction by the Kansas State Highway Commission. And, it also incorporated special Kansas Turnpike provisions and supplemental specifications, all of which were made integral parts of the construction contract, with the proviso that in the event of a discrepancy between the standard or general specifications and the supplemental specifications or special provisions, the latter would govern.

■ Section 5.1 of the general provisions of the contract authorized the project engineer to decide "all questions which may arise as to the interpretation in the plans and specifications, and all questions as to the acceptable fulfillment of the terms of the contract." The appellant first takes the position that authority to decide all questions arising out of the interpretation of the plans and specifications and the fulfillment of the terms of the contract carried with it the power and authority to construe the contract to determine whether it provided for the payment of additional compensation for the work redone and for which claim is made here. The parties were of course free to stipulate that the Authority's engineer, or any one else for that matter, would be the final arbiter of all disputes arising out of the performance of the contract. And see United States v. Gleason, 175 U.S. 588, 602, 20 S.Ct. 228, 44 L.Ed. 284; United States v. Wunderlich, 342 U.S. 98, 72 S.Ct. 154, 96 L.Ed. 113. The provision of the contract invoked is under the heading "Control of Work," and in its context seems to make the engineer the sole judge of whether the performance of the contract was in accordance with the plans and specifications and not to delegate to him the power to decide questions of law involving an interpretation of the contract, traditionally left to the courts. Certainly we should not construe the contract to preclude judicial inquiry unless intention to do so was clear and unequivocal. Indeed, the appellant states that the only question for decision is one of law to construe the contract within its four corners, including the various specifications which are integral parts thereof. We do not think the parties intended to commit this legal question to the Authority's engineer. Cf. United States v. Nickel, 10 Cir., 243 F.2d 924.

■ Coming then to the pertinent provisions of the contract, Section 4.1 of the general specifications recited in material part that it was the intent of the plans and specifications "to provide for the execution and completion in every detail of the work described herein." And, as we shall see, the plans and specifications did provide for every detail of the work to be performed under the contract as well as the method and manner of performing it. Section 7.14 under the topical heading of "Legal Relationships and Responsibilities to the Public," stipulated that the contractor should have charge and care of the work and "shall take every precaution against injury or damage to any part thereof by the action of the elements or from any other cause * * *"; and that "The contractor shall rebuild, repair, restore and make good all injuries or damages to any portion of the work occasioned by any of the above causes before final acceptance, and shall bear the expense thereof, except damage to the work due to unforeseen causes beyond the control of and without fault or negligence of the contractor, including, but not restricted to, acts of God * * *." There is nothing in this Section of the contract which could be construed as obligating the contractor to make good injuries or damages to the fill or embankment caused solely by the action of the elements without fault or negligence of the contractor. But in Section 9.2, under the heading "Measurement and Payment,"

the contractor agreed to accept the compensation provided in the contract "in full payment * * * for loss or damage arising from the nature of the work or from action of the elements, or from any unforeseen difficulties which may be encountered during the prosecution of the work until the final acceptance by the engineer * * *." On their face, these provisions seem contradictory, and so we must look further for conciliation.

Section 18, entitled "Embankments—Construction Methods," provided that "The contractor shall be responsible for the stability of all constructed embankments, and shall replace at his own expense any portion which, in the opinion of the engineer, have become displaced due to carelessness or negligent work on the part of the contractor, or by reason of ordinary rains and climatic effects." The record shows that immediately after the embankment had been brought up to grade and specifications, 7.27 inches of rain fell in this area from September 22 to October 5. No one contends that this amount of rain was ordinary for this time and place.

Under the special provisions, the contractor agreed to maintain the grade and drainage being performed "until final acceptance of the work, or until such time as the paving contractor is ready to commence operations in the areas concerned." In the supplemental specifications and under Section 13.40 entitled "Method of Measurement," the contractor agreed to remove, replace and recompact the embankment material at his own expense where soft or spongy spots are the result of placing improper material in the embankment, or failure to properly compact the material. And finally we come to Section 20.42 of the supplemental specifications providing in detail for "compaction requirements." This section of the contract, which revised the entire sub-article on "Compaction of Earthwork," specifically provided for the blading and rolling of the entire surface of each layer or lift of earth "to insure that all the fill material is uniformly compacted to the required density"; and "in the event any yielding or soft spots were developed under this rolling, it should be repaired and made firm to withstand this rolling before additional lifts are made." The section furthermore specifically provided that "wherever in any stage of construction yielding or soft spots are a result of placing improper material, failure to properly compact the embankment, or to provide for surface drainage, repair shall be at the contractor's expense."

In a colloquy between court and counsel during the trial, counsel for the Authority, speaking of the practical construction of the contract, significantly stated that, "There is one thing we do in practice, we apply the paragraph in subject 5 to the subject covered by No. 5. We apply the provisions under paragraph 18 to embankments. We apply the provisions under paragraph 20 to compaction. And in doing that we don't get the ambiguity that Your Honor has seen in this lawsuit."

Judged by the language of the foregoing section on compaction, it would seem, as the trial court reasoned, that the parties did specify not only the manner and method of compacting the embankment, but the conditions under which the contractor would be required to recompact the embankment in the event of failure. And as we have seen, the parties were at pains elsewhere in the contract to particularize the instances and conditions in which the contractor was under a duty to repair, rebuild, replace, restore, or recompact yielding or soft spots which developed in the embankment during the construction and before final inspection. And in each instance, save one, viz., Section 9.2, the duty to repair or recompact was contingent upon the negligence or fault of the contractor.

When the contract is viewed by the whole of its parts, it is certainly susceptible of the construction that the parties did intend to specify the circumstances and conditions under which the contractor would be liable to repair or recompact the embankments. Having

**716**

thus specified the conditions upon which the contractor shall be required to re-compact, it seems permissible to say, as did the trial court, that the plans and specifications, considered as a whole, contemplated that the contractor would be paid for recompacting the embankment which he had constructed according to specifications and which failed through no fault of his. This construction of the contract is consonant with evidence in the record to the effect that the parties on the job construed the contract to provide that if the fill or embankment was properly constructed and inspected by the engineers, and left free draining and soft spots developed, the contractors were to be paid for recomputing the fills and embankment. And it is also consistent with record evidence that this construction of the contract comported with custom and usages in the industry.

Viewed in this light, we certainly cannot say that the trial court's construction of the contract was clearly erroneous, and the judgment is affirmed.