**COTO–MATIC, INC., Appellant,**

**v.**

**The HOME INDEMNITY COMPANY and Harry Keener, Trustee in Bankruptcy for Industrial Engineer Co., Inc., Appellees.**

**No. 7874.**

United States Court of Appeals Tenth Circuit.

Dec. 10, 1965.

Rehearing Denied Jan. 5, 1966.

■

Richard C. Hite, Wichita, Kan. (W. A. Kahrs, Robert H. Nelson, H. W. Fanning, Darrell D. Kellogg and Roger Sherwood, Wichita, Kan., on the brief), for appellant.

Paul Scott Kelly, Jr., Kansas City, Mo., (John Murphy, Kansas City, Mo., Lyndon Gamelson and Donald C. Tinker, Jr., Wichita, Kan., for appellee Home Indemnity Co.; Charles Anderson, Wichita, Kan., for intervenor-appellee, Harry Keener; Tucker, Murphy, Wilson, Lane & Kelly, Kansas City, Mo., Gamelson, Robbins & Tinker and Anderson, Clark & Appling, Wichita, Kan., of counsel, were on the brief), for appellees.

Before PHILLIPS, LEWIS and BREITENSTEIN, Circuit Judges.

DAVID T. LEWIS, Circuit Judge.

This diversity action was filed in the District of Kansas by the appellant-plaintiff to recover upon a performance bond furnished by the defendant Home Indemnity Company as surety for Industrial Engineering Co., Inc. (Industrial) upon allegations that Industrial had breached a written contract for the fabrication of a metal painting machine. The appellee Keener was permitted to intervene in his capacity as trustee in bankruptcy for Industrial and counterclaimed for judgment for payment monies claimed under the

contract. The trial court determined that Industrial had substantially performed its contract, denied recovery to plaintiff, and awarded judgment on the counterclaim. The plaintiff's appellate contentions attack the trial court's findings and conclusions as not supported by the evidence and, more specifically, attack the trial court's categorization of the subject contract as a plan and specification contract and not an end result contract.

The machine fabricated by Industrial was designated by the contracting parties as a "Five Stage Continuous Coil Stock Finishing System." Its general concept originated with plaintiff's founder and subsequent general manager, Clarence Hooper, who, while visiting in Los Angeles, had observed the operation of a semi-automated process for applying paint to small steel sheets. Hooper, an industrial paint salesman, determined that a probable market for a comparable machine existed in the Wichita, Kansas area and began making inquiry about the possibilities of building such a machine. He was first referred to the owner of Jake's Steel Fabricating Company of Wichita, received some assurance that the idea was feasible, and was referred over to Industrial for whom Jake's company had done considerable subcontracting.

Hooper knew that Industrial was not a firm of consulting engineers but was primarily engaged in the sale and installation of heating controls, pumps and blowers. However, Industrial evinced interest in the project and numerous discussions ensued during the course of which the concept of the machine was expanded to that of a fully automatic process for painting coiled aluminum or steel. In general, the process contemplated a decoiler or unwinder of the coiled metal, a series of metal treatment tanks, a dry off tower, a paint applicator and bake oven, and a rewinder or recoiler, all operating through a connecting and timed system.

After some three months of talks Hooper requested and received on March 29, 1960, from Industrial a price quotation setting out the materials and components of the machine. This quotation provided in part that: 1) the process was to be a five stage continuous coil stock finishing system, 2) the decoiler was to handle coils of 26 gauge steel or aluminum from 4,000 to 6,000 lbs, 24 to 36 inches in width, 3) the process speed was to be 10 feet per minute, 4) power spray washer and rinse cabinets were to be provided according to certain specifications and be followed by a drying cabinet twelve feet in length, 5) a strip coater or continuous roller coater process would be provided to paint both sides of the metal, 6) a large 42-foot bake oven would be constructed with two temperature zones of 200 and 500 degrees respectively, 7) a hydraulically driven coil rewinder would be fabricated to handle coils of the same weight and size as the decoiler.

During the first week in April Industrial supplemented its quotation with a layout drawing of the proposed machine. This schematic was not a design drawing but did indicate the proposed components, the sequence of their operation and, in general, reflected the parties' broad concept of the machine, i. e., that metal would be fed off the decoiler in one direction until it had passed through about half the process, then elevated and reversed in direction and returned to a recoiler located very near the decoiler.

On May 16, 1960, Coto-Matic and Industrial executed a written contract, pertinent parts of which follows:

"Whereas, Contractor has prepared and submitted to Owner, an instrument designed, 'Quotation,' dated March 29, 1960, and drawings, dated April 4, 1960, with reference to the construction and placing in use of equipment for a five-stage continuous coil stock finishing system and therein set out certain equipment and material, which is to be used in the construction of equipment for said finishing system and,

Whereas, Owner is desirous of employing Contractor for the instal-

lation and construction of said project.

Now, Therefore, It Is Agreed by and between the parties as follows, for and in consideration of the mutual conditions and covenants as hereinafter set forth.

1. Contractor shall furnish all of the materials as set forth in the Quotation and Drawing which are hereto attached and made a part hereof by reference.

2. Contractor shall submit to Owner, prior to signing of contract, general specifications (which are listed in quotation and drawing), showing the equipment to be installed and placed into operation. Said specifications and drawings shall be deemed to have been approved by Owner upon his signing of contract. It shall be agreed that these drawings are subject to minor deviations or changes which may be required to improve manufacturability or function, or for adaptability to specific installation requirements.

Major changes, if any, in specifications or drawings shall be approved by each of the parties in writing and the contract price set forth herein shall be changed accordingly and approved by the parties in writing.

3. Upon the approval of the specifications and drawings above referred to, and signing of the contract, Owner shall thereupon pay the Contractor, a sum equal to Fifteen per cent (15%) of the total cost of said project, said total cost being in the amount of $32,943.00 plus any use and sales taxes. Contractor agrees to do everything required by this agreement and the specifications and drawings, which by reference, after approval thereof, shall be made a part hereof. * * *

5. Final payment shall be made by Owner to Contractor within thirty (30) days after said equipment has been installed and found to be in a workable mechanical order. Upon receipt of written notice by Contractor to Owner that same is ready for final inspection, same shall be promptly inspected by Owner, and Contractor shall thereupon issue a final certificate stating that work provided for has been completed and that said equipment is in proper working condition. At the time of said inspection Owner shall notify Contractor in writing of any and all deficiencies. If contractor is in agreement with said deficiencies, Contractor will promptly remedy them, * * *.

6. Prior to the commencement of work pursuant to this contract, Contractor shall furnish to Owner, a good and sufficient bond, guaranteeing the full and complete performance by Contractor of the terms of this contract, specifications and drawings. * * *

7. Owner shall furnish and install all necessary electric starters, stacks for gas burners, combustion air intakes, exhaust vents, and shall furnish and bring to within five feet (5) of necessary location electricity, gas, drains, and water lines at Owner's expense. Contractor is to provide all labor and material as set forth in said plans and specifications and quotations and is to do all things necessary for the proper construction and completion of said equipment which shall be done in a workmanlike manner, it being understood, however, that Contractor is liable only for the mechanical suitability of the equipment."

Printed upon the reverse side of the quotation, and thus incorporated in the contract was the provision: "We (Industrial) will not be liable for * * * liability with respect to use, misuse, purpose or suitability, * * *." Also listed in the quotation was a piece of equipment known as a stitcher for use in joining together two coils of metal.

Upon execution of the contract, Industrial and its subcontractor, Jake, began construction of the machine with Hooper conferring with them as fabrication progressed and not infrequently directing changes. During the initial construction period Hooper made another out-of-state visit and for the first time saw an operating strip coater, one using accumulators, a device which accomplished the stitching of metal coils together without stoppage of the painting operation. He asked Industrial for a quotation on accumulators for a machine operating at 20 feet per minute but was refused. Construction under the parties' original agreement continued.

In early September the machine was considered to be operative and a test run was made. Both parties agreed that the test was not satisfactory and Hooper prepared a punch list (a check list of deficiencies) and Industrial undertook to make adjustments and corrections. In Mid-September a second test was run with a 350-foot coil of 36-inch aluminum and, again, Industrial undertook to make adjustments. After doing so, Industrial considered its fabrication work to be complete and its contract to have been performed. The machine proved to be an economic failure, due, perhaps, to numerous factors but certainly including the fact that it could not operate continuously in the sense that an indefinite amount of metal could be painted without stopping the machine. The machine required a process shutdown as new coils of metal were stitched together. And economic success would have been more likely, and probably dependent upon, a much faster operation than the machine's capacity of 10 feet per minute.

■ As we have earlier indicated, the trial court's judgment is premised upon a conclusion that "the intention of the parties was merely one to do a certain work according to a prescribed plan and specification." The court reasoned that since there was no language in the contract sufficiently clear to show that it was the intention of the parties to obtain a definite result the agreement should be considered a "specified manner and method" contract. However, we do not consider the contract to be subject to such literal classification. As stated in Kansas Turnpike Authority v. Abramson, 10 Cir., 275 F.2d 711, cert. denied, 363 U.S. 813, 80 S.Ct. 1250, 4 L.Ed.2d 1154, "Construction by classification or categorization is rendered difficult, if not impossible, by the fact that contracts like ours call for an end result according to specifications." Similarly, the present contract lies somewhere between the contested extremes. Its requirements depend upon the intent of the parties to be gathered from the text and context.

■ This court stated in Kansas Turnpike Authority v. Abramson, supra, that " 'When the principal object of the contract is to obtain a result * * * the risk of accomplishing such purpose or result is on the builder.' Glass v. Wiesner, 172 Kan. 133, 238 P.2d 712, 716. Where, however, the contract provides for the performance of a given undertaking in accordance with prescribed plan and specification, this rule does not apply, because the contractor is not permitted to vary from the prescribed plans and specifications 'even if he deems them improper and insufficient; and therefore cannot be held to guarantee that work performed as required by them will be free from defects, * * * or accomplish the purpose intended.' " The discretion and authority given Industrial would appear to negate any consideration that it operated within the narrow definition of a specified manner and method contract. Moreover, Industrial was not given an engineering design plan as the basis for its fabrication, but drew its own general layout according to the owner's concept of the proposed machine.

■ We also consider the construction given the contract by the fabricator during the creation and installation of the machine to be of particular import in its interpretation. Their approach to the job implies an intent to construct a machine that would properly handle and paint coils of metal within the defined limitations. It is difficult to comprehend

that either the contractors or the owners contemplated building such a unique piece of machinery with only its size and dimensions in mind—disregarding for contract purposes whether it would actually and ultimately process and paint metal as originally conceived.

A good example is the testimony given by Jake Winfrey, the subcontractor, who did the metal tool work and installation. He stated that prior to the first test run he and his men spent about five days "trying to make the material run through the machine without wobbling. And we absolutely, we liked to have pulled our hair out trying to get it to stop this." His great concern at this time was not whether the machine had met certain specifications but whether it would actually process metal coils. He further testified that he did not have a copy of the quotation during construction, that he received some verbal instructions, and that he worked out the solution to problems as they were encountered. And he specifically testified that his intent was to do whatever was necessary to get the machine in proper working order.

 But it does not follow that the parties' agreement contemplated the end result that the machine would operate continuously, a primary contention that appellant makes. Both the contract and the conduct of the parties negative such a contractual commitment upon the part of Industrial.

As the trial court properly concluded, the "continuous" operation of the machine had no reference to the ability of the machine to continue to process stock without being stopped for the stitching of a new coil but clearly referred to the parties' concept of a coil of metal definite in width but indefinite in length. The problem of continuous feeding into the machine required accumulators, a stage not provided for in the agreed layout and specifically recognized by Hooper when, after the first test he complained in the punch sheet that the machine did not properly "brake to stop coil for stitching before entry into clearing process." We conclude, therefore, that the obligation of Industrial was not to accomplish an unqualified end result for a continuous finishing system in that phrase's broad sense but was limited to a contractual obligation to fabricate a mechanically suitable machine capable of meeting the parties' concept of a five-stage operation properly coordinated in time and function and in accord with the contractually agreed upon plans and specifications. Although the evidence and testimony is in sharp conflict as to whether Industrial substantially performed this obligation as a matter of fact, we agree with appellee that the trial court's pertinent findings are not clearly erroneous and find sufficient support in the record. It would serve no purpose to detail the evidence upon the issue beyond noting that much of appellant's evidence was projected against a background of unsuccessful commercial runs conducted as speeds greater than ten feet per minute and after adjusting the machine in an attempt to meet after-acquired knowledge of commercial need. Indeed, the parties' loose procedures in arriving at a contractual understanding were continued upon the parties' agreeing to a misunderstanding. The machine was never tested against the exact specifications of its contemplated functions. So, although we consider some of appellant's evidence to be impressive, particularly regarding the claimed malfunction of the decoiler, the determinative issue remains one of fact for the trial court and we are not convinced that substantial justice has been defeated by a manifest mistake. In such cases we will not disturb the judgment. Rapid Transit Company v. United States, 10 Cir., 295 F.2d 465, cert. denied, 369 U.S. 819, 82 S.Ct. 831, 7 L.Ed.2d 785.

Affirmed.