**S. J. GROVES & SONS COMPANY, a corporation of the State of Minnesota, authorized to do business in the State of New Jersey, Plaintiff,**

v.

**NEW JERSEY TURNPIKE AUTHORI-TY, a body corporate and politic of the State of New Jersey, Defendant.**

Civ. No. 531–66.

United States District Court
D. New Jersey,
Civil Division.

May 18, 1967.

Milton, Keane & DeBona, by John J. Hanlon, Jr., Jersey City, N. J., for plaintiff.

Grover C. Richman, Gen. Counsel to N. J. Turnpike Authority, by Joseph R. Postizzi, New Brunswick, N. J., for defendant.

## OPINION

COOLAHAN, District Judge:

### I.

Plaintiff S. J. Groves & Sons Company, a Minnesota corporation, seeks damages from the New Jersey Turnpike Authority [the Authority], for breach of construction contract. The contract is between Groves and the Authority; New Jersey is not a party to the contract nor a defendant to the suit. Jurisdiction is posited on diversity of citizenship and damages exceed $10,000.00.

In addition to denials and a counterclaim, the Authority challenges this Court's jurisdiction to entertain suits against it because of the immunity conferred by the Eleventh Amendment of the United States Constitution. It also challenges the Court's jurisdiction over this particular diversity suit.

Plaintiff moved under Rule 12(b) and (d) of the Federal Rules of Civil Procedure for a preliminary hearing on the separate defenses regarding this Court's jurisdiction.

Both of these defenses rest on the Authority's basic claim that it is an "alter ego" of the State of New Jersey, or put differently, that it is an inextricable part of the State Government. On this assumption, defendant argues the instant suit is tantamount to an action directly against New Jersey which would be barred by the Eleventh Amendment [hereinafter sometimes referred to as "the Amendment"].[1] The Authority also claims that as part and parcel of the State it is not a citizen within the meaning of the diversity statute which

extends this Court's jurisdiction to suits between "citizens of different States." 28 U.S.C. § 1332.

The plaintiff claims that, as an autonomous corporation distinct from the State, the Authority does not come under the aegis of the Amendment. Plaintiff further contends the Authority is a "citizen" within the diversity statute. It stresses that the Legislature authorized the Authority "to sue and be sued", N.J.S.A. 27:23–1 et seq. [New Jersey Turnpike Authority Act, Section 5]; that authorization is urged as a waiver of any immunity under the Amendment.

The Authority replies that the pertinent question is simply whether it is the alter ego of the State; if it is, waiver of sovereign immunity is not relevant. Moreover, the Authority maintains that whether the Amendment applies to this diversity action is a question of State law under Erie v. Tompkins, 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938).

Neither analysis is fully accurate, and it will be helpful, prior to examining the exact nature of the Authority, to sort out the several species of "sovereign immunity" which have become entangled in the course of argument.

■ One starts with the fundamental proposition that Federal Courts may not entertain suits by private parties against a State without its consent;[2] neither suits by citizens of another State or foreign nation, by virtue of the Amendment's express prohibition; nor suits by its own citizens, by virtue of the underlying postulates of sovereignty which the Amendment embodies.[3]

---

1. "The Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects of a Foreign State." Amend. XI, U.S.Const.

2. The Amendment does not preclude suits by the United States itself or by another State, since the several States deeded at least that much of their sovereignty to form a Union. United States v. State of

California, 297 U.S. 175, 56 S.Ct. 421, 80 L.Ed. 567 (1936); Com. of Virginia v. State of West Virginia, 206 U.S. 290, 27 S.Ct. 732, 51 L.Ed. 1068 (1907).

3. Parden v. Terminal Ry. Co., 377 U.S. 184, 84 S.Ct. 1207, 12 L.Ed.2d 233 (1963); Hans v. State of Louisiana, 134 U.S. 1, 10 S.Ct. 504, 33 L.Ed. 842 (1889); Principality of Monaco v. State of Mississippi, 292 U.S. 313, 54 S.Ct. 745, 78 L.Ed. 1282 (1933).

■ Second, since diversity jurisdiction requires "citizens" of different States, an agency not deemed a citizen of its State may only be sued upon a Federal question. The test for such citizenship overlaps the test for the Amendment; if it is not considered part of the State within the Amendment, an agency is usually *ipso facto* held to be its citizen. State Highway Commission of Wyoming v. Utah Const. Co., 278 U.S. 194, 49 S.Ct. 104, 73 L.Ed. 262 (1928); Moss v. Calumet Paving Co., 201 F.Supp. 426 (S.D.Ind., 1962). However, diversity presents a distinct hurdle; unlike the Amendment, it does not involve a privilege belonging to the State. Thus, even though a State waives the Amendment to which one of its agencies is entitled, it cannot thereby create diversity jurisdiction if that agency is not a "citizen." Such jurisdiction may neither be enlarged nor diminished by the States. State Highway Commission of Wyoming v. Utah Co., supra, 278 U.S. at 199, 49 S.Ct. 104; O'Neill v. Early, 208 F.2d 286, 289 (4th Cir., 1953).

Next, there is the constellation of state-created immunities, not derived from the Federal Constitution, but based on traditional notions of the State's inherent sovereignty. By its own constitution or as a matter of common law, a State may withhold consent to be sued in its own courts. In addition, public corporations, counties, municipalities, and other instruments of State and local government often are sheltered by various doctrines loosely subsumed under the heading of "sovereign immunity." In some instances these creatures of the State are granted complete immunity from suit, while in others they are only immunized from tort liability. [The latter may be further broken down into the traditional proprietary-governmental dichotomy applied to municipal corporations.]

State agencies are sometimes protected from suit or from liability on theories of governmental immunity *even though* they cannot be considered alter egos of the State itself, at least by the Federal standard required to invoke the Amendment. Masse v. Pennsylvania Turnpike Comm., 163 F.Supp. 510 (E.D.Pa.1958). See American Governmental Tort Liability, 20 Rutgers L.Rev. 710 (1966), [discussing the American history of "sovereign immunity" in this sense].

■ A State institution, not protected by the Eleventh Amendment and also deemed a citizen, nonetheless may be immunized from diversity suit because the doors of the State courts are closed to its adversary, and this Court, under *Erie,* must do likewise. If the institution is clothed with complete immunity in the State courts, it is not suable here on a diversity claim; if it is only immune to certain liabilities, that too will be mirrored by partial immunity here. Whether it is immune in this sense, of course, is a question of State law. Masse v. Turnpike Comm., supra; Gerr v. Emrick, 283 F.2d 293 (3rd Cir., 1960).

This is the relevance of *Erie* to the problem of sovereign immunity in Federal litigation, *but it is only reached if the Eleventh Amendment is inapplicable*— and *Erie* is not pertinent to that determination.

■ Even in diversity actions, whether the agency comes within the meaning of the Eleventh Amendment is a question of Federal, not State, law. State Highway Comm. in Arkansas v. Kansas City Bridge Co., 81 F.2d 689 (8th Cir., 1936); NA-JA Const. Corp. v. Roberts, 259 F. Supp. 895 (D.Del., 1966); DeLong Corp. v. Oregon State Highway Comm., 233 F.Supp. 7 (D.Or.1964) aff'd 343 F.2d 911 (9th Cir., 1965), cert. den. 382 U.S. 877, 86 S.Ct. 161, 15 L.Ed.2d 119; State Highway Comm., supra; Zeidner v. Wulforst, 197 F.Supp. 23 (S.D.N.Y., 1961); Masse v. Pennsylvania Turnpike Comm., supra.[4]

---

4. "In making this determination, the federal courts will be influenced by state decisions, dealing with the character and status of state agencies, but ultimately the question is one which federal courts must answer." *DeLong,* supra, 233 F.Supp.

Finally, the State may set up a special tribunal of limited competence for all claims against itself and its agencies, to the exclusion of its courts of general jurisdiction. Since this Court in diversity is coordinate with those courts of general jurisdiction, *Erie* also compels refusal of jurisdiction in that situation. Zeidner v. Wulforst, supra.[5]

These distinctions between varieties of "sovereign immunity", though pertinent to Federal jurisdiction, are sometimes blurred in State litigation where the question is simply "can the plaintiff bring this action?" Immunity can properly be treated as a unitary question, without differentiating between an agency that has been established as a distinct entity from the State, but nevertheless clothed with governmental immunity; and an agency which is immune *because* it has been established as an alter ego of the State.

While the difference between the prohibition of the Amendment and the state-created immunities may be academic in State litigation, it is important in the matter at Bar.

 The protection of the Amendment may be waived by the States, Clark v. Barnard, 108 U.S. 436, 2 S.Ct. 878, 27 L.Ed. 780 (1883); Parden v. Terminal Ry. Co., supra, 377 U.S. at 186, 84 S.Ct. 1207. However, the State also may retain the Amendment, *while consenting to suit in its own courts.* Smith v. Reeves, 178 U.S. 436, 20 S.Ct. 919, 44 L.Ed. 1140 (1899); Chandler v. Dix, 194 U.S. 590, 24 S.Ct. 766, 48 L.Ed. 1129 (1903). Unless the State waives the Amendment, its restraint remains intact. Such waiver will not be lightly implied from consent to be sued in its own tribunals; it must be an explicit waiver by clear language. Murray v. Wilson Distilling Co., 213 U.S. 151, 171, 29 S.Ct. 458, 53 L.Ed. 742 (1908); Ford Motor Co. v. Department of Treasury of State of Indiana, 323 U.S. 459, 65 S.Ct. 347, 89 L.Ed. 389 (1944); Hamilton Mfg. Co. v. Trustees of State Colleges in Colo., 356 F.2d 599 (10th Cir., 1966).[6] Since

at 10. Both the Eleventh Amendment and a State's immunity in its own courts stem from the same common law roots in the ancient dogma that "the King can do no wrong." But each State may modify the scope of that privilege as it wishes, and such variation cannot form the basis for a Federal standard of constitutional jurisdiction. See Arkansas Highway Comm. v. Kansas City Bridge Co., supra, 81 F.2d at 689, 691. Although State courts sometimes refer to the Amendment they have no occasion to interpret it precisely. Therefore, I read the language defendant relies on in Harrison Const. Co. v. Ohio Turnpike Comm., 272 F.2d 337, 339 (6th Cir., 1959), to the effect that State decisions would be persuasive if not conclusive, as a reference to the obvious authority of such decisions on the type of agency created [interpreting the enabling statute; declaring the agency's factual relationship to the State in its operations; and analyzing the status of similar agencies in that State]. But to acknowledge that these are primarily State questions, is not to end the inquiry; this Court must then weigh its finding, based on State decisions, against the Federal case law on the Eleventh Amendment. See *Harrison Const.*, supra at 340–342.

5. In *Zeidner* The New York Thruway Authority was sued in tort. The court first found the Authority was not the alter ego of New York, as a matter of Federal law, then found that since the Authority could be sued only in the State court of claims and not courts of general jurisdiction, that immunity sufficed to preclude diversity jurisdiction. The New York Court of Claims is a constitutional court of record-using civil procedure and subject to appeal through regular judicial channels—rather than a true administrative tribunal such as the Illinois Court of Claims. But it still is a special court of limited competence, and Judge Bartels properly viewed it as distinct from the New York courts of general jurisdiction with which he sat as a sister forum in diversity actions. See "American Governmental Tort Liability," supra; Hart and Wechsler The Federal Courts and the Federal System, pg. 607 ff.

6. In State taxation cases this strict construction is explicitly based on the State's obvious concern to hear litigation affecting its revenues in its own courts. *Ford*, supra; but the rule has by no means been limited to tax litigation. *Murray*, supra, (contract to buy liquor); Copper S.S. Co.

the waiver is a matter of legislative intent, the determination is usually a question of State law. Parden v. Terminal Ry. Co., supra, 377 U.S. at 194, 84 S.Ct. 1207.[7]

■ On the other hand, if the agency does not come under the Amendment, then the State can only curtail Federal jurisdiction by closing its own courts. Unlike the protection of the Amendment, state-created immunities cannot be turned on and off—disregarded by the State in its own courts, but pressed as a bar to Federal jurisdiction. The States cannot limit this Court's diversity jurisdiction, conferred by Congress under the Constitution, to adjudicate a cause of action created by State law. Railway Co. v. Whitton's Administrator, 80 U.S. (13 Wall.) 270, 20 L.Ed. 571 (1871); Cowles v. Mercer County, 74 U.S. (7 Wall.) 118, 19 L.Ed. 86 (1868); Markham v. City of Newport News, 292 F.2d 711 (4th Cir., 1961); Sherman v. Ulmer, 201 F.Supp. 660 (E.D.Pa., 1962).[8]

With this framework in mind, our present problem becomes simpler. The defendant concedes there is no obstacle to this suit in New Jersey's courts. McCabe v. New Jersey Turnpike Authority, 35 N.J. 26, 170 A.2d 810 (1961); and

see Taylor v. New Jersey Highway Authority, 22 N.J. 454, 126 A.2d 313, 62 A.L.R.2d 1211 (1956).[9] Nor has New Jersey limited suit against the Authority to a special tribunal, cf. Zeidner v. Wulforst, supra, or place venue limitations on the availability of State forums.[10]

It only remains to decide whether the Eleventh Amendment applies to this suit against the Turnpike Authority. If it does, I must dismiss this action unless New Jersey has waived the Authority's immunity; if it does not, the Authority is a New Jersey "citizen", and plaintiff may press his claim here to the same extent that he could in a State forum.

### III.

Is a suit against the New Jersey Turnpike Authority a suit against New Jersey within the meaning of the Amendment? This is a matter of first impression, but after reviewing the numerous decisions of New Jersey courts, as well as pertinent State and Federal decisions of other jurisdictions I am convinced that it is not.

■ The Amendment initially was limited to cases in which the State was the defendant of record. But today, suits against State officers or agencies

v. State of Michigan, 194 F.2d 465 (6th Cir., 1952) (maritime libel); Skokomish Indian Tribe v. France, 269 F.2d 555 (9th Cir., 1955) (quiet title action).

7. If the waiver is claimed to have arisen from State action within the realm of Congressional regulation, the question of waiver is one of Federal law. *Parden*, supra, 377 U.S. at 196, 84 S.Ct. 1207 (state operating railroad in interstate commerce; Petty v. Tennessee-Missouri Bridge Comm., 359 U.S. 275, 79 S.Ct. 785, 3 L.Ed.2d 804 (1958) (waiver implied from interstate bridge compact).

8. This principle also comprehends other door-closing doctrines unrelated to sovereign immunity, which are binding under *Erie*. E.g. Ragan v. Merchants Transfer, 337 U.S. 530, 69 S.Ct. 1223, 93 L.Ed. 1520 (1949); Cohen v. Beneficial Loan Co., 337 U.S. 541, 69 S.Ct. 1221, 93 L.Ed. 1528 (1949). But see Hanna v. Plumer, 380 U.S. 460, 85 S.Ct. 1136, 14 L.Ed.2d 8 (1964).

Since the Amendment is not geared to diversity jurisdiction, a State's retention of the Amendment while consenting to suit in its own courts does not contravene the holding in *Whitton*. See Smith v. Reeves, supra, 178 U.S. at 442, 20 S. Ct. 919. Compare note 5, supra.

9. Both cases, discussed below, hold the respective Authorities liable in tort; each started from the assumption that the Authorities were at least liable in contract. 35 N.J. at 32, 170 A.2d 810; 22 N.J. at 467, 126 A.2d 313, 62 A.L.R.2d 1211.

10. While this Circuit deferred decision on the effect of such State venue provisions on Federal jurisdiction, Gerr v. Emrick, 283 F.2d 293, 297, (3rd Cir., 1960), it seems clear that they are ineffective as long as the action may be brought in some State court of general jurisdiction; Federal Courts may then follow their own venue statutes. Sherman v. Ulmer, supra; *Markham*, supra.

of a State may be in effect suits against the State subject to the Amendment, even though the State is not made a party. In re *Ayers*, 123 U.S. 443, 8 S.Ct. 164, 31 L.Ed. 216 (1887).[11] In such cases, the court must examine "the essential nature and effect of the proceedings" to determine whether the State is the real party in interest against whom relief is sought. Smith v. Reeves, supra; Ex parte State of New York, (Case No. 1) 256 U.S. 490, 41 S.Ct. 588, 65 L.Ed. 1057 (1920). This depends on the facts and considerations in each case. Pennsylvania Turnpike Comm. v. Welsh, 188 F.2d 447 (3rd Cir. (1951)).[12]

With the proliferation of governmental bodies below the State level, debate on the Amendment has shifted emphasis from individual State officers and employees to public authorities, municipal corporations, and other "bodies corporate and politic." See "Note, The Applicability of Sovereign Immunity to Independent Public Authorities." 74 Harv.L. Rev. 714 (1961).

■ Counties and municipalities do not partake of the Eleventh Amendment immunity enjoyed by the States. Lincoln County v. Luning, 133 U.S. 529, 10 S.Ct. 363, 33 L.Ed. 766 (1890); Pettibone v. Cook County, 120 F.2d 850 (8th Cir., 1941); N. M. Patterson & Sons v. City of Chicago, 176 F.Supp. 323 (N.D. Ill., 1959), although they clearly are

public bodies and in many cases perform functions on behalf of the State. *NAJA Construction Corp.*, supra. Whether other bodies come under the Amendment depends on their relationship to the State, on the powers and responsibilities, the attributes and limitations, with which they have been endowed. Murray v. Wilson Distilling Co., supra; Pennsylvania Turnpike Comm. v. Welsh, supra. Where monetary damages are sought, the dominant factor is the impact of such relief upon the State treasury. State Highway Comm. v. Utah Const. Co., supra; Ford v. Dept. of Treasury, supra, cf. Gallena v. Scott, 11 N.J. 231, 94 A.2d 312 (1953); see also "The Applicability of Sovereign Immunity to Independent Public Authorities", supra (and cases cited). But no single factor is controlling. Pennsylvania Turnpike Comm. v. Welsh, supra.

The New Jersey Turnpike is an independent public authority, combining certain attributes common to State executive departments, on the one hand, with qualities common to municipal or private corporations, on the other. Created to improve vehicular traffic by the construction of modern expressways, New Jersey Turnpike Authority Act, N.J.S.A. 27:23–1, et seq., it exercises a number of powers free of any substantial legislative supervision. It may issue revenue bonds, payable from tolls and other rev-

11. The Amendment was the prompt reaction to the decision in Chisolm v. State of Georgia, 2 U.S. (2 Dall.) 419, 1 L.Ed. 440 (1793) upholding Federal jurisdiction over State debts to foreigners and citizens of other States. See Hans v. State of Louisiana, supra. The Amendment was weakened by a line of cases following Osborn v. Bank of the United States, 22 U.S. (9 Wheat.) 738, 6 L.Ed. 204 (1824) which held that the Court would not look beyond the record parties to the lawsuit. After successive cases in which the State's interest was too obvious to be ignored, the full power of the provision was revived by the conclusion in *Ayers* that to secure the manifest purpose of the Amendment "it must be held to cover, not only suits brought against a state by name, but those against its officers, agents and represen-

tatives, where the state, though not named as such, is, nevertheless, *the only real party against which alone * * * the relief is asked, and against which the judgment or decree effectively operates.*" 123 U.S. at 505, 8 S.Ct. at 183. [Emphasis added.]

12. This approach does not include an equally well established but distinguishable line of cases holding that suit against an official or agency for alleged deprivation of the plaintiff's constitutional rights is not barred by the Eleventh Amendment, even though the action is defended as an act of the State. Prout v. Starr, 188 U.S. 537, 23 S.Ct. 398, 47 L.Ed. 584 (1903); Mississippi R.R. Comm. v. Illinois Central R.R., 203 U.S. 335, 340, 27 S.Ct. 90, 51 L.Ed. 209 (1906).

enues of the Authority (Sec. 1); the only alternative is refunding through new Authority bonds (Sec. 2). The Authority is also empowered to set tolls; to enter contracts in its own name; to sue and be sued; to construct, repair and operate turnpike projects; to acquire property by purchase or otherwise, including exercise of eminent domain— also in its own name; and to hire professional and other employees, not carried on the State payroll nor subject to the general Civil Service for State employees [N.J.S.A. 11]. (Sec. 5). The Authority is composed of three members, appointed by the Governor with the consent of the Senate. As such, they constitute a "body corporate and politic" established in the State Highway Department and officially designated as "an instrumentality exercising public and essential governmental functions * * * of the State." (Sec. 3).

The most complete analysis of its status in light of these powers was provided by Chief Justice Vanderbilt in a declaratory judgment action brought to test the constitutionality of the Act under the New Jersey Constitution. New Jersey Turnpike Authority v. Parsons, 3 N.J. 235, 69 A.2d 875 (1949). It was feared that the Act might be an unconstitutional pledge of the State's credit *for* the activities of a body not subject to regular executive and legislative controls. Justice Vanderbilt's reply was twofold. First, he emphasized that the Authority's bonds were disengaged from the State treasury by express provision that they are not a debt or a liability or a pledge of faith and credit of the State. (Sec. 2). He then noted the general disclaimer of State responsibility for any liabilities.[13]

As for the contention that New Jersey would still be responsible for the debts of its creature, the learned jurist said:

"This view flies in the face of long established principles of government. *Though created by the State and subject to dissolution by the State, they are, in the eyes of the law, independent entities * * *.* The fact that the members of the Turnpike Authority are appointed by the Governor * * rather than elected by the voters *in nowise alters the status of the Turnpike Authority* as an independent entity." 3 N.J. at 243, 69 A.2d at 879. [Emphasis supplied.]

Another argument, also advanced here, was dispatched as follows:

"It is also objected that the Turnpike Authority is the *alter ego* of the State and not a self-sufficient public corporation because it is a body corporate and politic 'in the State Highway Department', R.S. 27:23–3. This statutory provision is manifestly intended to be a compliance with the constitutional provision requiring that 'all executive and administrative offices, departments, and instrumentalities of the State government * * * shall be allocated by law among and within not more than twenty principal departments.' Article V., Section IV, paragraph 1. But the State Highway Commissioner is given no authority whatsoever over the Turnpike Authority. The Turnpike Authority *is in but not of* the Highway Department and the fact *does not make it any the less an independent entity, as the language of the entire Act clearly demonstrates.*" 3 N.J. at 244, 69 A.2d 879. [Emphasis supplied.]

13. "Still further negativing any ground for holding the State liable for the activities of the Turnpike Authority is the next paragraph of the Act, which goes beyond the matter of the bonds * * * to deal with all the financial transactions of the [Authority]: 'All expenses incurred in carrying out the provisions of this act shall be payable solely from the funds provided under the authority of this act and nothing in this act shall be construed to authorize the Authority to incur indebtedness on behalf of the or payable by the State or any political subdivision thereof.'" 3 N.J. at 242, 69 A.2d at 878.

The Act was upheld,[14] with the exception of Section 17, which permitted advances of State funds for initial feasibility studies and designs. This provision was struck down as an invalid loan of State credit, N.J.Const. Art. VIII, Sec. 2, para. 1, since no regular appropriation to the Authority was made by the State legislature. See 3 N.J. at 247, 69 A.2d 875.

Two subsequent decisions affirmed the Authority's distinct status.[15] In addition, the distinction between its admittedly public character and its independence from the State was illustrated in a pair of cases involving Turnpike and Highway Authority employees.[16]

In the face of this consensus, the defendant relies on the decisions in Safeway Trails, Inc. v. Furman, 41 N.J. 467, 197 A.2d 366 (1964) cert. den. 379 U.S. 14, 85 S.Ct. 144, 13 L.Ed.2d 84, and Muszynski v. New Jersey Turnpike Authority, 27 N.J.Super. 248, 99 A.2d 326 (App.Div.1953). Defendant claims that Safeway Trails "clearly and concisely resolves the issue" before me. This view is somewhat sanguine inasmuch as that opinion does not deal with sovereign immunity and at most teaches that the Authority is a public, not private, corporation performing a government function for the State.

Beyond that, the court held that New Jersey incurs some expenses which are fairly allocable to Turnpike operations; but to approve such allocation is not to find that a legal judgment against the Authority is relief against the State.[17]

14. While *Parsons* is not an estoppel, it hardly behooves the Authority to minimize the autonomy on which its legitimation was based; having emphasized that independence then to show its constitutionality, it should be slow to deny it now merely because its own ends will be better served.

15. In City of Newark v. New Jersey Turnpike Authority, 7 N.J. 377, 81 A.2d 705 (1951), Justice Vanderbilt declined to enjoin the Turnpike's interchange construction and noted its hybrid nature as an independent "body both corporate and public, analagous in many respects to a municipal corporation." 7 N.J. at 381, 81 A.2d 705. Behnke v. Highway Authority, 13 N.J. 14, 15, 97 A.2d 647 (1953) was a suit similar to *Parsons*, challenging the Highway Authority Act. The main difference between the two bodies is that the Highway Authority—primarily established to build the "Garden State Parkway"—issues bonds guaranteed by the State. This was not provided in the initial Act, N.J.S.A. 27:12B–1 et seq. but in the "Guaranty Act" which makes the State "unconditionally liable for the payment, when due, of the principal and interest on the bond so guaranteed." Session Laws, 1952, c. 17, Secs. 3, 4. The objection to this guaranty was based on the same provision which had led Justice Vanderbilt to strike Section 17 of the Turnpike Act. Art. VIII, Sec. 2, para. 1 of the State Constitution. The court distinguished *Parsons* on the ground that the guaranty of the Highway Authority's bonds was contingent on a referendum deemed "sufficient to impart constitutional sanction. * * *" 13 N.J. at 30, 97 A.2d 647.

16. Mathews v. Finley, 46 N.J.Super. 175, 134 A.2d 441 (App.Div., 1957), rejected a Highway Authority employee's pension claim against the State. The court cited *Behnke* and *Parsons* for the proposition that both Authorities were substantially antonomous and their employees not "employees of the State." On the other hand, such employees *do* have the rights and duties of "public employees" in collective bargaining. Turnpike Authority v. American Federation of State, County and Municipal-Employees, 83 N.J.Super. 389, 200 A.2d 134 (App.Div., 1964).

17. The issue in *Safeway Trails* was whether the Interstate Bus Tax, N.J.S.A. 48:4–20, imposed for using the "highways of New Jersey", included the Turnpike and Garden State Parkway. In this context the court rejected the view that those roads were private. "The Turnpike Authority and the Highway Authority cannot be equated to private companies operating toll roads. These Authorities have been designated instrumentalities of the State * * *. In effect, they are arms of the State government operating certain highways for the State." 41 N.J. at 483, 197 A.2d at 374.

The plaintiff also attacked compensation to the State since the Turnpike paid its own upkeep out of tolls. The court viewed "compensation" in a broader sense, noting the increased maintenance

The *Muszynski* decision did refer to the Authority as the State's alter ego, 27 N.J.Super. at 251, 99 A.2d 326 but the dispute was whether a landowner had any remedy for condemnation loss other than normal eminent domain procedure. The issue was thus one of tort liability, not total immunity from suit, and the result was later explained in terms of legislative intent to provide an exclusive remedy for such damage. Taylor v. Highway Authority, supra, 22 N.J. at 471, 126 A.2d 313, 62 A.L.R.2d 1211. In any event, to the extent that Muszyn-

ski *was* based on a finding that the Authority was synonymous with the State, it would appear to be inconsistent with both State v. Maas & Waldstein Co., 83 N.J.Super. 211, 199 A.2d 248 (App.Div., 1964),[18] and the flat statement in *Parsons*, supra.

Even McCabe v. Turnpike Authority, supra, which found that New Jersey had waived the "sovereign immunity" from tort liability to which the Authority was entitled as a governmental agency, reemphasized the Authority's independence from the State itself.[19]

---

costs for access roads near the Turnpike which received extra traffic as a result. It upheld the fairness of reimbursing the State for a ratable portion of State-wide highway programs (State Police, drunken driver control, traffic safety programs, etc.) which the Turnpike did not help defray, although it received some benefit from them. I note that the court did *not* rely on the cost of the Turnpike operation itself as a State expense; that would have been the more direct and natural answer if the Authority was in fact viewed as the alter ego of the State.

18. The Highway Commissioner, as head of the State Highway Department, condemned certain submerged lands, uplands, and riparian rights, owned by Maas & Waldstein and necessary for the Route 21 Freeway. The court started with "the basic proposition that the State Highway Commissioner is the alter ego of the State. [citations omitted]" 83 N.J.Super. at 217, 199 A.2d at 251.

The defendant had contrasted the Commissioner's authority with that of the Turnpike Authority and the Highway Authority. It argued that while the Turnpike Act and the Highway Authority Act provided those bodies with condemnation power over interests including submerged or riparian ones, no such power was found in the statutory enumeration of the Highway Department's power. Judge Goldman's reply is pertinent to the theories advanced here:

"These acts [the Highway Authority Act and the Turnpike Authority Act] deal with agencies created by the State and placed in the State Highway Department for the purpose of carrying out a particular project. *Unlike the State Highway Department, they are not the alter ego of the State;* in the eyes of the law, they are independent

entities. [citing *Parsons*] This being so, the Legislature had to make clear that they possessed the power of condemnation of particular rights, including lands under water and riparian rights." 83 N.J.Super. at 219, 199 A.2d at 252. [Emphasis added.]

Of course the matter before me requires no decision—and I express none—on whether a suit against the Highway Authority, as distinct from the Turnpike Authority, would be a suit. against New Jersey within the meaning of the Eleventh Amendment because of the State's ultimate responsibility for the former's financial obligations. See the discussion of Behnke v. Highway Authority, supra at note 15 of this opinion, and Mathews v. Finley, supra, 46 N.J.Super. at 183, 134 A.2d 441.

19. The precise holding in *McCabe* and in *Taylor*, supra, which it followed, was that the State had not intended to cloak either Authority with the traditional governmental tort immunity enjoyed by State agencies. Port of N. Y. Authority v. Hackensack Water Co., 41 N.J. 90, 105, 195 A.2d 1 (1963). *McCabe* further refused to distinguish between the Turnpike's liability for proprietary versus governmental activities—a question left open in Taylor. In *Taylor* the court had observed: "It would seem that in all justice *such Authorities should generally not be afforded the highly special immunities of the State acting in its sovereign capacity * * *.*" 22 N.J. at 470, 126 A.2d at 322, 62 A.L.R.2d 1211. [Emphasis added.] Similarly in *McCabe*, although the court made general reference to State agencies being entitled to "sovereign immunity", 35 N.J. at 31, 170 A.2d 810, it was clearly speaking of tort liability. Moreover, it based its finding that this immunity had been waived in the enabling statute in part

In summary, New Jersey has created a public Corporation with substantial fiscal and managerial autonomy and has insulated the State treasury from the Authority's obligations and liabilities. The Authority acquires property, enters contracts and sues on its own behalf, but for organizational purposes it is pigeonholed in the State Highway Department. That it performs an essential governmental function as an instrumentality of the State is *not* disputed. Nevertheless, New Jersey courts repeatedly have held that its fortunes were not so closely tied to the State as to make it a mere nominee or alter ego. In light of all these factors, the Authority is not protected by the Eleventh Amendment as a matter of Federal law.

The same result has been reached in many jurisdictions where the State turnpike corporations were independent entities, acting on their own behalf and not dependent on the State treasury for funds. Harrison Const. Co. v. Ohio Turnpike Comm., supra; Guaranty Trust Co. of New York v. West Virginia Turnpike Comm., 109 F.Supp. 286 (S.D.W.Va., 1952); Masse v. Pennsylvania Turnpike Comm., supra; [and other Pennsylvania Turnpike cases cited]; Kansas Turnpike Authority v. Abramson, 275 F.2d 711 (10th Cir., 1960; Moss v. Calumet Paving Co., supra. [Indiana]; Zeidner v. Wulforst, supra. [New York].[20]

In other jurisdictions, State Highway Commissions found to be integral parts of the Highway Department, acting on behalf of the State and dependent on the State treasury for funds, were protected by the Amendment since the relief was really being sought against the State through its agent. State Highway Comm. of Wyoming v. Utah Const. Co., supra; State Highway Comm. of Arkansas v. Kansas City Bridge Co., supra; De-Long v. Oregon Highway Comm., supra; Weyerhauser Co. v. Roads Comm. of Maryland, 187 F.Supp. 766 (D.Md., 1960); cf. Southern Ry. Co. v. South Carolina Highway Dept., 246 F.Supp. 435 (E.D.S.C., 1965). Further, while the *Abramson* case held the Kansas Turnpike Authority is not an alter ego of the State, that State's Highway Commission is. Stamey v. State Highway Comm. of Kansas, 76 F.Supp. 946 (D.Kan.1948). It also is relevant that in the latter cases

on the Authority's independence as a corporate entity: "It exercises a number of powers free of any great legislative supervision. * * * *This last-mentioned power to fix tolls takes on significance when it is considered that the burden of payment of tort judgments rendered against the Authority would ultimately fall upon the users of the Turnpike facilities rather than the State.*" 35 N.J. at 34, 170 A.2d at 814. [Emphasis added.]

20. In fact, *Zeidner* held that judgment against the New York Thruway would not have a sufficiently direct impact on the State treasury to justify resort to the Amendment, *even though* the Authority's bonds were fully guaranteed by a pledge of the State's credit; there was no indication that the Authority could not meet its obligations.

Similarly, New Jersey has an interest in the Turnpike, whose property is ultimately held for the people of the State, cf. Port of New York Authority v. Hackensack Water Co., supra. 41 N.J. at 106, 195 A.2d 1. But the interest is prospective and the affect of a judgment is indirect. The operation of the Turnpike is designed to be self-liquidating with the Authority operated toll free as part of the State Highway Department upon payment of all bonds, *Safeway Trails*, supra, 41 N.J. at 475, 197 A. 2d 366. But this fact cuts both ways. The impact of a judgment against the Authority must be met by increased tolls, or by delay in retiring the Authority's bonds. Toll increases will not drain the State's coffers. And since the Turnpike is to be operated free of tolls after its transfer to the State, postponement of that transfer would, if anything, be a benefit to the State treasury, in the sense that the sooner the bonds are retired, the sooner the State acquires a new expense borne by the general taxpayers. Only where the plan for disposition of turnpike facilities contemplates operation by the State with continued tolls can the postponement of bond retirement by judgment against the Authority be said to delay the State's acquisition of an opportunity for new revenues.

the State had not set up a separate corporation for a specific project, but rather was operating through its own highway department. See *DeLong*, supra, 233 F. Supp. at 13; *Weyerhauser*, supra, 187 Supp. at 772–773.

In the only case applying the Amendment to a distinct turnpike commission, the State had financed the operation and exerted substantial control over it. Florida State Turnpike Comm. v. Van Kirk, 146 F.Supp. 364 (S.D.Fla., 1956). Hence the opinion followed the decision in Wyoming Highway Comm. v. Utah Const., supra, and is distinguishable.

The overriding point which emerges from all these decisions is this: such public corporations usually perform governmental functions and their tasks are often ones historically undertaken directly by the State. Their designation in the enabling acts as "arms" or "instruments" of the State performing "essential governmental functions" does not *per se* make them tantamount to the State within the Eleventh Amendment; [21] "the government does not become the conduit of its immunity in suits against its agents or instrumentalities merely because they do its work." Keifer & Keifer v. RFC, 306 U.S. 381, 388, 59 S.Ct. 516, 517, 83 L.Ed. 784 (1938) (Mr. Justice Frankfurter).

The fact remains that the legislature has a wide range of choice in constituting such bodies: it may fashion an agency as an integral part of the appropriate department in the Executive branch; or, for whatever reasons, it may prefer to establish an autonomous body, ultimately subject to political control but operating as an independent entity. Beyond doubt, New Jersey has set up the Turnpike Authority with the latter choice in mind.

Surprisingly, the defendant asserts that to stress the test of whether a judgment against the Authority would come from State funds is a "narrow and archaic definition" of what is the State, which "would take us back a hundred years." It argues that precisely because the State has found it desirable to establish a separate body in order to obtain independent financing, this Court should extend immunity to that agency.

On the contrary, it is defendant who is swimming against the prevailing tide of decisions and scholarly comment, all of which point to a functional analysis of the interests underlying the application of "sovereign immunity" to new and different situations. "Sovereign immunity" carries an august sound, but as Judge Mack emphasized many years ago:

> "Where the application of the doctrine is not clear, a solution is not to be found by reference to strict Austinian theory which assumes, by mere definition, that the sovereign is not subject to its own laws. Nor is it to be found by uncritical reference to historical origins. The reasons which in the past led to the exemption of the sovereign from suit may or may not justify the extension of the principle in modern law. *. * * [The court] * * * may have to chose between competing judicial analogies and parallel trends of judicial thought; its conclusions should, if possible, conform to the practical ends of the law in a moving, working world." The Pesaro, 277 F. 473, 475 (2nd Cir., 1921).

Immunity under the Eleventh Amendment is an attribute of the State only in its corporate sovereign capacity; if our complex society necessitates delegation of certain tasks to independent agents for the State, the rationale of the Amendment does not dictate its extension to them as well. It may be, as the defendant Authority claims, that it ranks *just below* the State itself in the hierachy of New Jersey's political system; for our purposes, "just below" is far enough. The plaintiff's motion to strike the defense of lack of jurisdiction is granted.

Let an appropriate order be submitted on notice to all parties.

---

21. Such statutory designation was not dispositive in *Harrison Const.*, supra, Moss v. Calumet, supra, or Masse v. Penn. Turnpike Comm., supra.